

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, and STATE OF WISCONSIN, | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**12   6592**<br><br>Civil Action No. _____<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

*EX REL.* [UNDER SEAL],

      Plaintiffs,

vs.

[UNDER SEAL],

      Defendants.



JP

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, and STATE OF WISCONSIN, | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>Civil Action No. _____<br><br>**COMPLAINT**<br><br>Jury Trial Demanded<br><br>**FILED**<br><br>NOV 26 2012<br><br>MICHAEL E. KUNZ, Clerk<br>By _____ Dep. Clerk |
| *EX REL.* E. DANIEL PETTY, CHRISTOPHER ALLEN BELL, KYLE LEE RICHARDSON AND TARA LYN DENNEY, | |
| Plaintiffs, | |
| vs. | |
| SHIRE REGENERATIVE MEDICINE, INC. f/k/a ADVANCED BIOHEALING, INC., SHIRE PHARMACEUTICALS INC., and SHIRE PLC, | |
| Defendants. | |

Plaintiffs and relators E. DANIEL PETTY, CHRISTOPHER ALLEN BELL, KYLE LEE

RICHARDSON AND TARA LYN DENNEY ("Relators"), by and through their attorneys, state

that this is an action brought by Relators against defendants SHIRE REGENERATIVE

MEDICINE, INC. f/k/a ADVANCED BIOHEALING, INC. ("ABH"), SHIRE

PHARMACEUTICALS INC. ("Shire Pharmaceuticals"), and SHIRE PLC ("Shire plc")

(collectively, "Defendants") on behalf of the United States of America ("United States"), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), and on behalf of the State of California, State of Colorado, State of Connecticut, State of Delaware, District of Columbia, State of Florida, State of Georgia, State of Hawaii, State of Illinois, State of Indiana, State of Iowa, State of Louisiana, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Montana, State of Nevada, State of New Hampshire, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oklahoma, State of Rhode Island, State of Tennessee, State of Texas, Commonwealth of Virginia, State of Washington, and State of Wisconsin (collectively, the "State Plaintiffs"), pursuant to the California False Claims Act, Cal. Gov. Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, Co. Rev. Stat. § 25.5-4-303.5 *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*; Delaware False Claim and Reporting Act, 6 Del. C. § 1201 *et seq.*; District of Columbia Procurement Reform Act, D.C. Code § 2-381.01 *et seq.*; Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; Iowa Medicaid False Claims Act, Iowa Code Ann. § 685.1 *et seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*; Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5 *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mont. Code Ann. § 17-8-403 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. §357.010 *et*

2

*seq.*; New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*; New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New York False Claims Act, N.Y. State Fin. § 187 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okla. Stat. Ann. § 5053 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq.*; and the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.* (collectively, the "State Acts"), respectively.

## INTRODUCTION

1.     This is an action to recover treble damages and civil penalties on behalf of the United States and the State Plaintiffs (collectively, the "Government") arising from false or fraudulent claims and/or false statements or records ("False Claims") made, used, presented, or caused to be made, used, or presented, by Defendants to the Government in violation of the FCA and the relevant State Acts.

2.     The False Claims alleged herein were made, used, or presented to defraud Government-funded health benefit programs, including, but not limited to, Medicare, Medicaid, the Federal Employees Health Benefits Program ("FEHBP"), TRICARE/CHAMPUS, and the Department of Veterans Affairs ("VA") healthcare system (collectively, "Government Health Programs"), of millions of dollars that should have been used to pay for the medically necessary and appropriate treatment of patients with pressure wounds, venous leg ulcers, and certain other conditions, but were instead used to pay for the off-label treatment of those same patients using

3

the fibroblast-derived dermal substitute Dermagraft® ("Dermagraft").

3.      The False Claims alleged herein were also used, or presented to defraud Government Health Programs of millions of dollars through a national marketing program pursuant to which Defendants paid remuneration to physicians and to employees of physicians' offices in the forms of, *inter alia*, free meals, free tickets to sporting events, gifts, gift cards, telephone gift cards, free continuing medical education, paid participation in speakers' bureaus and programs, whether or not the physician ever actually spoke at any such event, as well as free preparation of claims for payment, free review and preparation of patients' charts, free coding of patients' conditions, and free advice on the use and placement of Dermagraft in violation of the Anti-Kickback Statue, 42 U.S.C. § 1320a-7b(b).

## SUMMARY OF ALLEGATIONS

4.      Dermagraft is a medical device, which has been approved by the U.S. Food and Drug Administration ("FDA") for the limited purpose of treating "full-thickness diabetic foot ulcers greater than six weeks in duration, which extend through the dermis, but without tendon, muscle, joint capsule, or bone exposure."

5.      During their employment at ABH, Relators learned that, from in or about February 2007 through in or about June 2012, Defendants perpetrated a nationwide scheme focused on the promotion of Dermagraft for various off-label uses – *i.e.*, uses for which the device was never approved by the FDA.

6.      By and through their scheme, Defendants directly made, used, or presented False Claims, and caused others – including physicians, hospitals, and healthcare providers – to make, use, or present False Claims, to the Government in seeking and/or receiving payments for off-label uses of Dermagraft.

4

7.     As stated above, as part of their off-label marketing scheme, Defendants also offered and paid valuable remuneration to certain physicians, hospitals, and healthcare providers with the intention of increasing the use of Dermagraft by those providers in direct violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute"). In turn, both Defendants and the providers that accepted kickbacks from Defendants filed false and/or fraudulent certifications regarding their compliance with applicable federal rules, regulations and healthcare laws, including the Anti-Kickback Statute.

8.     To maximize their revenue and profits, Defendants also engaged in a pattern and practice of improperly billing Government Health Programs for *unused* units of Dermagraft.

9.     As a result of Defendants' deceptive and improper conduct, the Government has incurred millions of dollars in damages.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3730, and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to the FCA.

11.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States.

12.    Venue is proper in the Eastern District of Pennsylvania pursuant to 31 U.S.C. § 3732(a) because the principal place of business of Shire Pharmaceuticals is located in this judicial district, Defendants transact business within this district, and Defendants engaged in certain acts proscribed by 31 U.S.C. § 3729 within this district.

5

13.    In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera*, shall remain under seal for a period of at least sixty (60) days, and shall not be served upon Defendants until the Court so orders.

14.    In accordance with 31 U.S.C. § 3730(b)(2), Relators provided the Government with a copy of this Complaint and a written disclosure of substantially all material evidence and information in their possession either before or contemporaneously with the filing of this Complaint. More specifically, Relators complied with this provision by serving copies of this Complaint and such written disclosure upon Peg Hutchinson, Assistant United States Attorney for the Eastern District of Pennsylvania, and Eric H. Holder, Jr., United States Attorney General.

## THE PARTIES

### A. The Relators

15.    Relator E. Daniel Petty ("Petty") is a citizen and resident of the State of North Carolina with approximately twenty years of experience in the field of medical device sales.

16.    From July 8, 2010 through September 30, 2011, Petty worked as a territory manager for ABH in the Federal Markets division.

17.    As a territory manager within ABH's Federal Markets division, Petty was responsible for the marketing and sale of Dermagraft to Government-owned healthcare facilities within his territory in North Carolina and eastern Tennessee, including, but not limited to, various facilities owned and operated by the VA.

18.    As a result of his experience as territory manager for ABH, Petty gained extensive knowledge of Defendants' practices and the violations alleged herein.

19.    Relator Christopher Allen Bell ("Bell") is a citizen and resident of the City of Humble, County of Harris, State of Texas, who was employed by ABH as an Advanced

6

Technology Specialist in Houston North Territory from on or about April 1, 2009 to December 31, 2009.

20.     Relator Kyle Lee Richardson ("Richardson") is a citizen and resident of the City of Carrollton, County of Denton, State of Texas, who was employed by ABH as an Advanced Technology Specialist in Houston South Territory from March 2009 to July 21, 2010.

21.     Tara Lyn Denney ("Denney") is a citizen and resident of the City of West Monroe, Quachita Parish, State of Louisiana, who was employed by ABH as an Advanced Technology Specialist in Shreveport, Louisiana, from November 2009 to May 2010.

22.     As Advanced Technology Specialists within ABH's Commercial division, Bell, Richardson and Denney were responsible for the marketing and sale of Dermagraft to physicians, physician groups, clinics and other healthcare providers by reason of which they gained extensive knowledge of Defendants' practices and the violations alleged herein.

23.     Relators bring this action for violations of the FCA on behalf of themselves and the United States pursuant to 31 U.S.C. § 3730(b)(1).

24.     Relators also bring this action for violations of the State Acts on behalf of the various State Plaintiffs.

25.     Relators are not aware of any "public disclosure" in connection with the False Claims alleged in this Complaint. In any event, Relators are "original source[s]" under the FCA and have knowledge that is both independent of and materially adds to the publicly disclosed allegations or transactions (to the extent that they exist).

26.     Petty's personal knowledge of the violations alleged in this Complaint was acquired during the course of his employment as a territory manager for ABH.

7

27.    Bell's, Richardson's and Denney's personal knowledge of the violations alleged in this Complaint was acquired during the course of their employment as Advanced Technology Specialists for ABH.

**B.  Defendant ABH**

28.    ABH, which is now known as Shire Regenerative Medicine, Inc., is a Delaware corporation having a principal place of business located in Westport, Connecticut.

29.    ABH was founded in January 2004 and, since May 2006, has owned the rights to Dermagraft.

30.    ABH was acquired by Shire plc on June 28, 2011 pursuant to a merger, which left ABH as an indirect wholly-owned subsidiary of Shire plc and a direct wholly-owned subsidiary of Shire Pharmaceuticals Inc.

31.    At the time of the merger, ABH employed over 400 people throughout the United States and operated its business primarily out of three sites: a manufacturing facility in La Jolla, California; corporate offices in Westport, Connecticut; and research laboratories in Brentwood, Tennessee.

**C.  Defendants Shire Pharmaceuticals Inc. and Shire plc**

32.    Shire Pharmaceuticals is a Delaware corporation, which operates as an indirect wholly owned subsidiary of Shire plc and has a principal place of business located in Wayne, Pennsylvania.

33.    Shire plc is an international conglomerate organized and existing under the laws of Jersey (Channel Islands) which registered and maintains its principal place of business in the Republic of Ireland.

34.    Shire plc – through Shire Pharmaceuticals Inc. – acquired ABH in June 2011.

8

35.     For the fiscal year ended December 31, 2011, Shire plc reported $4.263 billion in total revenue.

## GENERAL ALLEGATIONS

### A. The Federal False Claims Act

36.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act to facilitate enforcement and recovery by the United States and to encourage private enforcement by *qui tam* plaintiffs (often referred to as "relators"). Under the version of the FCA adopted by the False Claims Amendments Act, liability is imposed on any person who:

> a. knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval;
>
> b. knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> c. conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; or
>
> d. knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

*See* 31 U.S.C. § 3729(a)(1), (2), (3) and (7).

37.     On May 20, 2009, the FCA was again amended pursuant to the Fraud Enforcement and Recovery Act of 2009 ("FERA"). A person is liable for violation of the FCA, as amended by FERA, if the person:

> a. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> b. knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> c. conspires to commit a violation of 31 U.S.C. § 3729(a)(1); or

9

> d. knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

*See* 31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G).

38.    For purposes of the FCA, as amended by FERA, "knowing" or "knowingly" means that the defendant "(i) has actual knowledge of the falsity of the [relevant] information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. *Id.*

39.    The word "material" is defined under the FCA, as amended by FERA, as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

40.    The FCA, as amended by FERA, further provides that liability under the act shall include "a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . [for each unlawful act], plus 3 times the amount of the damages which the Government sustains because of the act . . . ." *See* 31 U.S.C. § 3729(a)(1).

## B. Government Health Programs

41.    Medicare is a federal government-funded health program primarily benefiting the elderly, which was created in 1965 with the adoption of Title XVIII of the Social Security Act. It is administered by the federal Health Care Financing Administration ("HCFA"), now known as CMS.

42.    Medicaid is a joint federal-state health benefits program generally available to

low-income adults and their children, as well as individuals with certain disabilities. While Medicaid is administered by the States (or State subcontractors), it is funded by both the States themselves and the federal government. In general, Medicaid's coverage for medical devices is significantly more expansive than that provided by Medicare. Although payment for medical devices is an optional service that States may choose to include in or exclude from the Medicaid programs, virtually every State has included some medical device coverage in its Medicaid plan.

43.     The FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association and Rural Carrier Benefit Plan, which provide health insurance coverage for federal employees, retirees and their dependents.

44.     TRICARE is the United States military's health care system, designed to maintain the health of active duty service personnel, provide healthcare during military operations, and offer healthcare to non-active duty beneficiaries, including dependents of active duty personnel, military retirees and their dependents.

45.     CHAMPUS, or the Civilian Health and Medical Program of the Uniformed Services, provides reimbursements to military families who must obtain care from civilian medical providers when care at a military hospital or clinic is not available.

46.     The VA operates a healthcare system separate from TRICARE/CHAMPUS. Through its Veterans Health Administration, the VA provides medical and related care to over 7.9 million eligible veterans. Generally, those eligible for coverage under both VA programs and Medicare must choose between the two programs each time they obtain services. So long as they do not qualify for TRICARE, veterans' surviving dependents may be eligible to receive care through the VA system under the Civilian Health and Medical Program of the Department of

11

Veterans Affairs ("CHAMPVA"). The VA provides most of its services through VA-owned and operated hospitals, nursing facilities, outpatient clinics and other healthcare service providers. In situations where eligible veterans obtain authorized care from non-VA facilities or providers, the VA makes payment or reimbursement determinations using methodologies similar to those used by Medicare.

## C. The State Acts

47.     Like the FCA, the State Acts are generally designed to allow states to recover damages sustained as a result of False Claims made, used, presented, or caused to be made, used, or presented, by a defendant.

48.     The State Acts are implicated when False Claims are made, used, presented, or caused to be made, used, or presented, to Government Health Programs funded in whole or in part by the States, including, but not limited to, Medicaid.

*The California False Claims Act,*
*Cal. Gov. Code § 12650 et seq. ("CA FCA")*

49.     Among other things, the CA FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to the State of California is liable for a civil penalty ranging from $5,000 up to $10,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of California.

50.     Under the CA FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

51.     The CA FCA further provides for liability for those who conspire to commit a

12

violation of the Act.

### The Colorado Medicaid False Claims Act,
### Co. Rev. Stat. § 25.5-4-303.5 et seq. ("CO MFCA")

52. Among other things, the CO MFCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to an officer or employee of the State of Colorado is liable for a civil penalty ranging from $5,000 up to $10,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Colorado.

53. Under the CO MFCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

54. The CO MFCA further provides for liability for those who conspire to commit a violation of the Act.

### The Connecticut False Claims Act,
### Conn. Gen. Stat. § 17b-301a et seq. ("CT FCA")

55. Among other things, the CT FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval under a medical assistance program administered by the State's Department of Social Services is liable for a civil penalty ranging from $5,500 up to $11,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Connecticut, plus the costs of investigation and prosecution of the violation.

56. Under the CT FCA, "knowing" and "knowingly" means that the defendant had

13

actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

57.   The CT FCA further provides for liability for those who conspire to commit a violation of the Act.

### *The Delaware False Claim and Reporting Act,*
### *6 Del. C. § 1201 et seq. ("DE FCA")*

58.   Among other things, the DE FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to an officer or employee of the State of Delaware is liable for a civil penalty ranging from $5,500 up to $11,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Delaware.

59.   Under the DE FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

60.   The DE FCA further provides for liability for those who conspire to defraud the State of Delaware by getting a false or fraudulent claim allowed or paid.

### *The District of Columbia Procurement Reform Act,*
### *D.C. Code § 2-381.01 et seq. ("DC FCA")*

61.   Among other things, the DC FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval to an

14

officer or employee of the District of Columbia is liable for three times the amount of damages sustained by the District of Columbia, plus the costs of a civil action brought to recover penalties or damages, and may also be liable for a civil penalty ranging from \$5,000 up to \$10,000 for each false claim.

62.     Under the DC FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Proof of specific intent to defraud is not required for an act to be "knowing" or "knowingly".

63.     The DC FCA further provides for liability for those who conspire to defraud the District of Columbia by getting a false or fraudulent claim allowed or paid.

*The Florida False Claims Act,*
*Fla. Stat. Ann. § 68.081 et seq. ("FL FCA")*

64.     Among other things, the FL FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to an officer or employee of the State of Florida is liable for a civil penalty ranging from \$5,500 up to \$11,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Florida.

65.     Under the FL FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

66.     The FL FCA further provides for liability for those who conspire to commit a violation of the Act.

15

*The Georgia False Medicaid Claims Act,*
*Ga. Code Ann. § 49-4-168 et seq. ("GA FMCA")*

67.     Among other things, the GA FMCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to the Georgia Medicaid program is liable for a civil penalty ranging from $5,500 up to $11,000 for false or fraudulent claim, plus up to three times the amount of damages sustained by the Georgia Medicaid program.

68.     Under the GA FMCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

69.     The GA FMCA further provides for liability for those who conspire to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

*Hawaii False Claims Act,*
*Haw. Rev. Stat. § 661-21 et seq. ("HI FCA")*

70.     Among other things, the HI FCA provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to an officer or employee of the State of Hawaii is liable for a civil penalty ranging from $5,000 up to $10,000 for each claim, plus up to three times the amount of damages sustained by the State of Hawaii.

71.     Under the HI FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. No proof of

16

specific intent to defraud is required.

72.     The HI FCA further provides for liability for those who conspire to defraud the State of Hawaii by getting a false or fraudulent claim allowed or paid.

### The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 et seq. ("IL FCA")

73.     Among other things, the IL FCA provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims, for payment or approval to the State of Illinois is liable for a civil penalty ranging from \$5,500 up to \$11,000 for each claim, plus up to three times the amount of damages sustained by the State of Illinois.

74.     Under the IL FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

75.     The IL FCA further provides for liability for those who conspire to defraud the State of Illinois by getting a false or fraudulent claim allowed or paid.

### The Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 et seq. ("IN FCA")

76.     Among other things, the IN FCA provides that any person who knowingly presents a false claim for payment or approval to the State of Indiana is liable for a civil penalty of at least \$5,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Indiana.

77.     Under the IN FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the

17

information or acted in reckless disregard of the truth or falsity of the information.

78.     The IN FCA further provides for liability for those who conspire to commit a violation of the Act or induces another to perform an act in violation of the Act.

### *The Iowa Medicaid False Claims Act,*
### *Iowa Code Ann. § 685.1 et seq. ("IA MFCA")*

79.     Among other things, the IA MFCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval is liable for a civil penalty of not less than and not more than the civil penalty allowed under the federal FCA for each false or fraudulent claim, plus three times the amount of damages sustained by the State of Iowa as a result of the false or fraudulent claims.

80.     Under the IA MFCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. "Knowing" or "knowingly" does not require proof of specific intent to defraud.

81.     The IA MFCA further provides for liability for those who conspire to commit a violation of the Act.

### *The Louisiana Medical Assistance Programs Integrity Law,*
### *La. Rev. Stat. Ann. § 46:437.1 et seq. ("LA MFCA")*

82.     Among other things, the LA MFCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each false or fraudulent claim, plus a civil fine not to exceed three times the amount of damages sustained by the State's medical assistance programs as a result of the false or fraudulent claims.

83.     Under the LA MFCA, "knowing" and "knowingly" means that the defendant had

18

actual knowledge of the information or acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

84.     The LA MFCA further provides for liability for those who conspire to defraud, or attempt to defraud, the State's medical assistance programs by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

### The Maryland False Health Claims Act,
### Md. Code Ann. Health-Gen. § 2-601 et seq. ("MD FHCA")

85.     Among other things, the MD FHCA provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims, for payment or approval to the State of Maryland is liable for a civil penalty not to exceed $10,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Maryland.

86.     Under the MD FHCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information.  Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

87.     The MD FHCA further provides for liability for those who conspire to commit a violation of the Act.

### The Massachusetts False Claims Act,
### Mass. Gen. Laws ch. 12, § 5 et seq. ("MA FCA")

88.     Among other things, the MA FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval is liable for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, sustained by the commonwealth or

19

political subdivision as a result of the violation.

89.     Under the MA FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required.

90.     The MA FCA further provides for liability for those who conspire to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim.

*The Michigan Medicaid False Claims Act,*
*Mich. Comp. Laws § 400.601 et seq. ("MI MFCA")*

91.     Among other things, the MI MFCA provides that any person who knowingly makes or presents, or causes to be made or presented, a false under the Medicaid program is guilty of a felony, punishable by imprisonment of not more than 4 years or a fine of not more than \$50,000, or both.

92.     Under the MI MFCA, "knowing" and "knowingly" means that the person was in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a Medicaid benefit. No proof of specific intent to defraud is required.

93.     The MI MFCA further provides for liability for those who conspire to defraud the State of Michigan by obtaining or aiding another to obtain the payment or allowance of a false claim under Medicaid.

*The Minnesota False Claims Act,*
*Minn. Stat. § 15C.01 et seq. ("MN FCA")*

94.     Among other things, the MN FCA provides that any person who knowingly

20

presents or causes to be presented false or fraudulent claims for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 per false or fraudulent claim, plus three times the amount of damages sustained by the State of Minnesota or political subdivision thereof as a result of the violation.

95.     Under the MN FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required.

96.     The MN FCA further provides for liability for those who conspire to present a false or fraudulent claim to the State of Minnesota or political subdivision thereof.

### *Montana False Claims Act,*
### *Mont. Code Ann. § 17-8-403 et seq. ("MT FCA")*

97.     Among other things, the MT FCA provides that any person who knowingly presents or causes to be presented to an officer of employee of the State of Montana a false claim for payment or approval, and thereby causes damage in excess of $500 to the State of Montana, is liable for a civil penalty of up to $10,000 per false claim, plus not less than two times and not more than three times the amount of damages sustained by the State of Montana as a result of the violation.

98.     Under the MT FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information.

99.     The MT FCA further provides for liability for those who conspire to defraud the State of Montana by getting a false claim allowed or paid.

21

*Nevada False Claims Act,*
*Nev. Rev. Stat. Ann. § 357.010 et seq. ("NV FCA")*

100.    Among other things, the NV FCA provides that any person who knowingly presents or causes to be a false claim for payment or approval is liable for a civil penalty of not less than $5,000 and not more than $10,000 per false claim, plus three times the amount of damages sustained by the State of Nevada or political subdivision thereof as a result of the violation.

101.    Under the NV FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required.

102.    The NV FCA further provides for liability for those who conspire to defraud the State of Nevada by obtaining allowance or payment of a false claim.

*The New Hampshire False Claims Act,*
*N.H. Rev. Stat. Ann. § 167:61-b et seq. ("NH FCA")*

103.    Among other things, the NH FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval to an officer or employee of the New Hampshire Department of Health and Human Services is liable for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the State of New Hampshire as a result of the violation.

104.    Under the NH FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required for an act to be knowing.

22

105.    The NH FCA further provides for liability for those conspire to defraud the New Hampshire Department of Health and Human Services by getting a false or fraudulent claim allowed or paid.

### The New Jersey False Claims Act,
### N.J.S.A. 2A:32C-1 et seq. ("NJ FCA")

106.    Among other things, the NJ FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to an employee, officer or agent of the State of New Jersey is liable for a civil penalty ranging from $5,500 up to $11,000 for each false claim, plus up to three times the amount of damages sustained by the State of New Jersey.

107.    Under the NJ FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information.  Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

108.    The NJ FCA further provides for liability for those who conspire to defraud the state by getting a false or fraudulent claim allowed or paid.

### The New Mexico Medicaid False Claims Act,
### N.M. Stat. Ann. § 27-14-1 et seq. ("NM MFCA")

109.    Among other things, the NM MFCA provides that any person who presents or causes to be presented to the State of New Mexico a claim for payment under the Medicaid program, knowing that such claim is false or fraudulent, is liable for three times the amount of damages sustained by the state as a result of the violation.

110.    The NM MFCA further provides for liability for those who conspire to defraud

23

the State of New Mexico by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

### The New York False Claims Act,
### N.Y. State Fin. § 187 et seq. ("NY FCA")

111.    Among other things, the NY FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval is liable for a civil penalty ranging from $6,000 up to $12,000 for each violation, plus three times the amount of damages, including consequential damages, sustained by the State of New York or local government as a result of the violations.

112.    Under the NY FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. "Knowing" and "knowingly" require no proof of specific intent to defraud.

113.    The NY FCA further provides for liability for those who conspire to commit a violation of the Act.

### The North Carolina False Claims Act,
### N.C. Gen. Stat. § 1-605 et seq. ("NC FCA")

114.    Among other things, the NC FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to the State of North Carolina is liable for a civil penalty ranging from $5,500 up to $11,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of North Carolina.

115.    Under the NC FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the

24

information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

116. The NC FCA further provides for liability for those who conspire to commit a violation of the Act.

### The Oklahoma Medicaid False Claims Act,
### 63 Okla. Stat. Ann. § 5053 et seq. ("OK MFCA")

117. Among other things, the OK MFCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to an officer or employee of the State of Oklahoma is liable for a civil penalty ranging from $5,000 up to $10,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Oklahoma.

118. Under the OK FMCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

119. The OK FMCA further provides for liability for those who conspire to commit a violation of the Act.

### The Rhode Island False Claims Act,
### R.I. Gen. Laws § 9-1.1-1 et seq. ("RI FCA")

120. Among other things, the RI FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval to an officer or employee of the State of Rhode Island is liable for a civil penalty ranging from $5,000

25

up to $10,000, plus three times the amount of damages sustained by the State of Rhode Island as a result of the violation, plus the costs of a civil action brought to recover any such penalty or damages.

121.    Under the RI FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. No specific intent to defraud is required.

122.    The RI FCA further provides for liability for those who conspire to defraud the State of Rhode Island by getting a false or fraudulent claim allowed or paid.

### *The Tennessee Medicaid False Claims Act,*
### *Tenn. Code Ann. § 71-5-181 et seq. ("TN MFCA")*

123.    Among other things, the TN MFCA provides that any person who presents or causes to be presented, to the State of Tennessee for payment under the Medicaid program, knowing such claim is false or fraudulent, is liable for a civil penalty ranging from $5,000 up to $25,000, plus three times the amount of damages sustained by the State of Tennessee as a result of the violation.

124.    Under the TN MFCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required.

125.    The TN MFCA further provides for liability for those who conspires to defraud the State of Tennessee by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

26

*The Texas Medicaid Fraud Prevention Act,*
*Tex. Hum. Res. Code Ann. § 36.001 et seq. ("TX MFCA")*

126.    Among other things, the TX MFCA provides that any person who knowingly presents or causes to be presented to the Texas Medicaid program a claim that contains a statement or representation the person knows or should know to be false, is liable for a civil penalty ranging from $5,000 up to $10,000 for each violation of the Act, escalated to $15,000 if the violation results in harm to an elderly person, plus up to two times the amount of damages sustained by the State of Texas.

127.    Under the TX MFCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

*The Virginia Fraud Against Taxpayers Act,*
*Va. Code Ann. § 8.01-216.1 et seq. ("VA FCA")*

128.    Among other things, the VA FCA provides that any person who knowingly presents or causes to be presented false or fraudulent claims, for payment or approval to the State of Virginia is liable for a civil penalty ranging from $5,500 up to $11,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Virginia.

129.    Under the VA FCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

27

130.    The VA FCA further provides for liability for those who conspire to commit a violation of the Act.

### The Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 et seq. ("WA MFFCA")

131.    Among other things, the WA MFFCA provides that any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval by any government entity of the State of Washington is liable for a civil penalty ranging from $5,500 up to $11,000 for each violation of the Act, plus up to three times the amount of damages sustained by the government entity.

132.    Under the WA MFFCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required.

133.    The WA MFFCA further provides for liability for those who conspire to commit a violation of the Act.

### The Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 et seq. ("WI MFCA")

134.    Among other things, the WI MFCA provides that any person who knowingly presents or causes to be presented a false claim for medical assistance to an officer, employee or agent of the State of Wisconsin is liable for a civil penalty ranging from $5,000 up to $10,000 for each violation of the Act, plus up to three times the amount of damages sustained by the State of Wisconsin.

135.    Under the WI MFCA, "knowing" and "knowingly" means that the defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the

28

information or acted in reckless disregard of the truth or falsity of the information. Knowledge by the defendant is established without regard as to whether the defendant intended to defraud the state.

136.    The WI FCL further provides for liability for those who conspire to defraud the State of Wisconsin by obtaining allowance or payment of a false claim for medical assistance.

## SPECIFIC ALLEGATIONS

### A. Description of Dermagraft

137.    Dermagraft is a "cryopreserved human fibroblast-derived dermal substitute; it is composed of fibroblasts, extracellular matrix, and a bioabsorbable scaffold."

138.    ABH manufactures Dermagraft using human fibroblast cells derived from donated newborn foreskin tissue. According to the Directions for Use for Dermagraft:

> The human fibroblast cells are from a qualified cell bank, which has been extensively tested for animal viruses, retroviruses, cell morphology, karyology, isoenzymes, and tumorigenicity. Reagents used in the manufacture of Dermagraft are tested and found free from viruses, retroviruses, endotoxins, and mycoplasma before use. Dermagraft is manufactured with sterile components under aseptic conditions within the final package.

139.    Dermagraft is supplied to physicians, hospitals, and other healthcare providers frozen in a clear bag containing one piece of approximately 2 inches x 3 inches (5 centimeters x 7.5 centimeters) for a single-use application.

140.    The price offered to VAs for Dermagraft during all or most of the relevant time period was $1,360.52 per unit, with an additional discount of two percent (2%) taken off the list price when forty (40) or more units were purchased.

### B. The FDA's Approval of Dermagraft

141.    The FDA approved Dermagraft in September 2001 "for use in the treatment of

29

full-thickness diabetic foot ulcers greater than six weeks in duration, which extend through the dermis, but without tendon, muscle, joint capsule, or bone exposure." At that time, Smith & Nephew owned the rights to the product.

142.     As explained in Shire plc's most recent annual report, diabetic foot ulcers ("DFUs") are "open sores or ulcers on the feet that can occur in people with diabetes as a result of peripheral neuropathy, or damage to the nerves and can severely compromise a patient's quality of life."

143.     Shire plc estimates that "DFUs affect nearly 900,000 people annually in the US, of which approximately 60% to 70% are estimated to be slow healers that could be treated with DERMAGRAFT, based on its approved indication."

144.     The Directions for Use for Dermagraft provide a detailed 24-step process for physicians and other providers to follow when using the device.

145.     The Directions for Use for Dermagraft also provide various precautions, including, but not limited to, the following:

> **Caution:** Do not use any topical agents, cytotoxic cleansing solutions, or medications (e.g., lotions, ointments, creams, or gels) on an ulcer being treated with Dermagraft as such preparations may cause reduced viability of Dermagraft.

> **Caution:** To ensure the delivery of metabolically alive, living cells to the patient's wound, do not hold Dermagraft at room temperature for more than 30 minutes. After 30 minutes, the product should be discarded and a new piece thawed and prepared consistent with Preparation for Use instructions.

> **Caution:** The persistence of Dermagraft in the wound and the safety of this device in diabetic foot ulcer patients beyond six months has not been evaluated. Testing has not revealed a tumorigenic potential for cells contained in the device. However, the long-term response to these cells is unknown.

> * * *

30

> **Caution:** The product must remain frozen at -75°C ± 10°C continuously until ready for use.
>
> **Caution:** Dermagraft has not been studied in patients receiving greater than 8 device applications.
>
> **Caution:** Dermagraft has not been studied in patients with wounds that extend into the tendon, muscle, joint capsule, or bone. Dermagraft has not been studied in children under the age of 18 years, in pregnant women, in patients with ulcers over a Charcot deformity of the mid-foot, or in patients receiving corticosteroids or immunosuppressive or cytotoxic agents.

146.    Dermagraft is specifically contraindicated for use "in ulcers that have signs of clinical infection or in ulcers with sinus tracts" and "in patients with known hypersensitivity to bovine products, as it may contain trace amounts of bovine proteins from the manufacturing medium and storage solution."

### C. ABH's Acquisition of Dermagraft

147.    ABH purchased the global rights to Dermagraft from Smith & Nephew in May 2006.

148.    ABH spent the nine (9) months following its purchase of Dermagraft renovating and revalidating the original Dermagraft manufacturing facility located in La Jolla, California.

149.    Eventually, ABH reinitiated manufacturing of Dermagraft and "shipped the first pieces of [ABH]-manufactured Dermagraft to U.S. customers on February 15, 2007."

150.    Significantly, ABH failed in its efforts to gain FDA approval for the use of Dermagraft in treatment of venous leg ulcers.

151.    On August 24, 2011, Shire plc announced that ABH decided not to pursue the venous leg ulcer indication after its phase three pivotal trial of Dermagraft in subjects with venous leg ulcers failed to prove the efficacy of the device for treatment of such patients.

31

## D. **ABH's Off-Label Marketing Scheme**

### *ABH Trained and Instructed Its Sales Force To Target Off-Label Providers*

152.    Dermagraft has never been approved by the FDA, or otherwise been proven to be safe and effective, for any use other than "use in the treatment of full-thickness [DFUs] greater than six weeks in duration, which extend through the dermis, but without tendon, muscle, joint capsule, or bone exposure."

153.    Beginning in 2007, however, ABH began to systematically and improperly promote Dermagraft for various off-label uses nationwide.

154.    Although ABH took an "official" position consistent with the FDA's prohibition against off-label marketing of medical devices so as to give the false appearance of compliance, ABH trained, encouraged and required their sales forces to promote off-label uses of Dermagraft and to target specialists and providers whom its management knew would be likely to purchase the device for off-label uses.

155.    By way of example, ABH emphasized the importance of sales calls to a wide range of providers other than podiatrists, including, but not limited to, general surgeons, plastic surgeons, vascular surgeons, wound nurses, and residents of spinal cord clinics.

156.    ABH undertook such targeting as a means of developing off-label sales of Dermagraft for use on ulcers and wounds located on parts of the body of than the foot and for use on non-diabetic patients.

157.    While employed by ABH, management specifically told Petty to target plastic surgeons, general surgeons, wound nurses, and spinal cord clinics in his sales territory.

32

158.    One group of plastic surgeons that management told Petty to target was a group of Duke Plastic Surgery residents working at the Wound Clinic at the Durham VA Medical Center ("Durham VA").

159.    Although some of the units of Dermagraft sold to the Wound Clinic would presumably have been used in accordance with the device's approved indication, Petty expected that *most of the units would be used off-label*. Nonetheless, Petty was instructed to aggressively promote the device for use in the Wound Clinic.

160.    In addition to sales calls and visits to a doctor who was eventually named Co-Director of the Wound Clinic, Petty arranged for the doctor to participate in a speaking engagement at Parizade Restaurant on or about February 8, 2011. ABH paid the doctor $500 for the speaking at the event, which was designed to inform the Duke Plastic Surgery residents about ways in which they could use Dermagraft in their practices, primarily as they rotated through residency at the Durham VA.

161.    During his employment at ABH, management also directed Petty to target a doctor at VA's Community Based Outpatient Clinic located in Hickory, North Carolina, who was not a podiatrist, but rather a general physician.

162.    Although the general physician was likely to use Dermagraft only for the off-label treatment of conditions including pressure wounds, leg wounds, and surgical wounds, Petty was instructed to establish clinic days with the general physician and aggressively promote the use of Dermagraft in his practice.

163.    Petty's Performance Appraisal Form for the 2010 review period confirms that Petty was instructed to target the general physician for the potential off-label use of Dermagraft.

33

164.    In large part due to Petty's efforts, the general physician started using Dermagraft shortly after Petty was terminated by ABH.

165.    Other sales representatives around the country similarly targeted providers whom they expected to use Dermagraft off-label.

166.    ABH instructed its sales representatives and other employees to tell physicians that ABH would pre-run all of each physician's diabetic ulcer patients and update the patients' charts so that the doctor would know what options he or she had in advance. The employees were instructed to tell the physicians that "you do not know what you can use until you know what is paid for." ABH's goal was to "keep the patient pipeline full."

167.    Employees of physicians' offices were instructed to "pull the face sheet" of each patient's file, to write the location of the ulcer on the face sheet, and to fax the face sheet to ABH. Case managers at physicians' offices were requested "to run down the patient schedule. All New Patients Get Targeted." ABH sales representatives were instructed to "schedule clinical hours with your busiest target," and were told "do not just work your case! Get there early and shadow a few non DG cases before your case."

168.    Further, ABH instructed all sales representatives that: "whether it is a new account or an existing account, consider taking over 95% of the IVR [Insurance Verification Results] responsibility" because "those who build the strongest perception that the are part of the wound care center win!"

- TELL the case manager how YOU will make this process very easy. DON'T ASK!
    - YOU will create a binder will [sic] all providers pre-filled/signed IVF's [Insurance Verification Form]. Tab them for easy access.

34

- YOU will manage the insurance process from helping to fill out paperwork (when applicable), helping to understand the present requirements and interpreting IVF results.

- YOU will post the bottom line verification in the "patient by" tab and in the patient's chart.

169.    ABH told its account representatives that:

Litmus Test When you Get It Right:

1.  Does your account call you to help with insurance?
2.  Can you visit the account without a case and feel like you are helping the staff? Updating Charts with Fax Back?
3.  Do you feel like a sales rep or an employee of the center?

170.    Within ABH, its aggressive marketing system was known as The Nick Rallo Method (the "Rallo Method") which was named after a former ABH Advanced Technology Specialist, who became a Regional Manager and, then, became the Eastern Area Director of sales.

171.    ABH used the Rallo Method and ABH's control over the IVR process in physicians' offices to code non-diabetic foot ulcers as diabetic foot ulcers in order to get those ulcers covered by and reimbursed by Medicare, Medicaid and other federal healthcare plans.

172.    Likewise, ABH used the Rallo Method and ABH's control over the IVR process in physicians' offices to code non-diabetic ulcers and other wounds in many parts of patients' bodies as diabetic foot ulcers in order to get those ulcers and other wounds covered by and reimbursed by Medicare, Medicaid and other federal healthcare plans.

173.    ABH advertised the Rallo Method to physicians as the Four Pillars:

[ABH] has become the partner of choice in wound care because of the high level of support we provide around insurance verification, case coverage, coding, documentation, and reimbursement expertise.

- **Pillar One - Insurance Verification:** We will partner with your center to pre-verify all patients and ensure everyone is

35

aware of the actual insurance coverage before Dermagraft therapy is initiated.

- **Pillar Two - Case Coverage**: We cover the most priority cases . . . to ensure Dermagraft optimization.

- **Pillar Three - Coding and Documentation**: We will work with you to ensure coding and documentation is appropriate to the standards of the Medicare LCD.

- **Pillar Four - Reimbursement**: We proactively conduct routine EOB audits for the center and the doctor to ensure reimbursement for Dermagraft is consistent with local LCD's.

174.    At the dinner meeting in West Houston, Texas, on August 20, 2009, ABH told sales representatives that they were routinely to code the primary diagnosis of every patient as Diabetes instead of venous insufficiency, an instruction which ABH repeated during a podiatry meeting dinner in the summer of 2009.

175.    ABH trained sales representatives on off-label uses of Dermagraft including the ankle, calf, thigh, unspecified lower limb, arms, trunk, head and hands and described the use of Dermagraft on ulcers and other wounds in areas of the body other than the feet.  ABH required the sales representatives to memorize the codes for ulcers and other wounds on each of these parts of the body.

176.    ABH designated its sales agents as "Advanced Technology Specialists," thereby attempting to give physicians and employees of physicians' offices the impression that its sales agents were, in fact, more than sales people.  Despite ABH's fancy name for its sales agents, they were, in fact, sales people.

### ABH Manipulated Its Bonus Incentive Programs To Encourage Off-Label Promotion and Sales

177.    ABH directly manipulated its bonus incentive programs to encourage the

36

promotion of off-label uses of Dermagraft by providers.

178.    All off-label sales were counted toward fulfillment of sales representatives' sales quotas and could serve as a basis for which bonuses would be determined.

179.    During the relevant time period, sales representatives at ABH were generally paid a base salary of between $90,000 and $95,000, plus a bonus of $100 for every unit of Dermagraft that they sold – regardless of whether the unit was sold for off-label use.

180.    Although it was theoretically possible to meet sales quotas without selling a significant number of units for off-label use, it was extremely difficult to do so – particularly for those sales representatives in regions without strong podiatry practices.

181.    Without selling off-label, it was *virtually impossible* to be among the top sellers at ABH, who would be appointed to the "1st President's Club" and become eligible for incentives including, but not limited to, free trips to Hawaii and Cabo San Lucas and the complimentary use of a new ABH-owned BMW for two years.

182.    ABH management sent daily e-mails to all sales representatives detailing the sales figures for the top sellers and pressuring other representatives to reach similar sales goals with the expectation that off-label sales would be undertaken.

183.    Sales representatives knew that a significant portion of the sales of certain top-selling representatives were derived primarily from off-label uses.

184.    By way of example, Petty discovered during national and regional conference calls that one sales representative – who was touted by Federal Markets Division Manager Todd Clawson ("Clawson") as one of ABH's top performers nationwide – made approximately sixty percent (60%) of his sales to providers at a Houston VA in connection with the off-label treatment of pressure wounds.

37

185.    In short, the only realistic way for sales representatives to reach expected levels of performance was to find ways to increase off-label sales of Dermagraft.

### ABH Trained and Instructed Its Sales Force To Promote Dermagraft Using Misleading and Incomplete Information

186.    ABH also trained and instructed sales representatives to share with providers anecdotal, individual case observations about the "promising effects" of Dermagraft in connection with a number of off-label uses, including, but not limited to, use in the treatment of venous leg ulcers and to help fill voids in the skin after Mohs surgery or certain types of implants.

187.    For example, on June 13, 2012, Petty received an e-mail from ABH's Paul Hulme attaching a Microsoft Excel spreadsheet labeled "Dermagraft Healing Review – Bath, NY VAMC." The spreadsheet detailed the apparent efficacy of Dermagraft in treating various off-label conditions, including pressure ulcers, stasis ulcers, and an abdominal dehiscence, in patients at the VA's residential community living center located in Bath, New York. Petty understood that this information was to be shared with providers in his own sales territory as a means of encouraging similar off-label uses.

188.    Clawson similarly created an Excel spreadsheet form demonstrating that Dermagraft was to be marketed to providers treating patients with various conditions other than the DFUs for which the device was indicated, including, but not limited to, podiatrists, wound care specialists, plastic surgeons, dermatologists, spinal cord clinics, vascular surgeons, and general surgeons. Petty received the template for such a spreadsheet during his training at ABH.

189.    According to Petty, the mantra that was often repeated by Clawson with respect to VAs was "Dive Deep," which Petty understood to mean that sales representatives should market

38

Dermagraft to all types of providers – not just podiatrists – even if use of the device by such providers would be strictly off-label.

190.    Petty participated in national and regional conference calls with sales representatives from areas around the country – including, but not limited to, Kansas, Texas, North Carolina, Tennessee and Alabama – during which Regional Manager Lex Harris and other individuals in management discussed the relative "success" of sales made to providers of off-label medical treatment.

191.    At the 2011 Commercial Team Meeting held in August 2011 in Orlando, Florida, ABH's Mark Wilson conducted a presentation called "Dermagraft Mission: Possible," which highlighted possible uses of Dermagraft in connection with the off-label treatment of wounds and vascular disease.

192.    ABH further provided sales representatives with printed articles, studies and other clinical documents, which Petty and other sales representatives then shared with physicians and other healthcare providers.

193.    Petty recalls that one article in particular – Roberts and Mansbridge, *The Scientific Basis and Differentiating Features of Dermagraft*, Can. J. Plast. Surg. (January/February 2002) – focused more on the scientific features of Dermagraft than its singular FDA indication.  Accordingly, management instructed Petty and other sales representatives to use the Roberts-Mansbridge article when promoting Dermagraft off-label.

194.    Sales representatives at ABH also had access to various PowerPoint presentations provided by ABH management during sales training sessions. These presentations could be altered depending on whether the sales representative was presenting to an on-label or off-label audience.

195. On at least one occasion, Petty presented a set of PowerPoint slides to plastic surgery residents at Duke University Medical Center, which he tailored to highlight specific areas of interest for plastic surgeons, including anecdotal case studies suggesting that Dermagraft may be efficacious even when used off-label.

196. In or about July 2010, Clark Mohar, who was then a Regional Manager for ABH, conducted a training session attended by Petty and other sales representatives in La Jolla, California, which specifically highlighted the use of Dermagraft to treat patients with venous leg ulcers.

197. After the negative results of ABH's phase three pivotal trial of Dermagraft in subjects with venous leg ulcers were released approximately a year later, ABH management directed sales representatives to continue to "EXECUTE THE NATIONAL STRATEGY!" – meaning that they should continue to promote off-label use of Dermagraft for venous leg ulcers despite the negative trial results.

198. According to Clawson, providers with questions regarding the trial could be directed to contact ABH's medical department or falsely informed that the data was still being reviewed.

### ABH Sales Representatives Ran "Clinics" To Promote Off-Label Uses of Dermagraft

199. During a typical week at ABH, sales representatives ran regularly scheduled "clinics" at several locations throughout their respective sales territories.

200. During these clinics, the sales representatives would remain on-site with several units of Dermagraft while providers saw patients for which the device could potentially be used.

201. Despite the fact that ABH sales representatives are not physicians or even nurses, ABH encouraged them to be physically present when physicians and/or nurses applied

40

Dermagraft to their patients. Often, sales representatives were required to advise physicians and/or nurses on the placement of Dermagraft and other operative procedures.

202.     ABH representatives regularly and routinely opened the Dermagraft packages and demonstrated how the device should be prepared and applied, using actual patients as their subjects.

203.     In some instances, sales representatives would perform one or more parts of the 24-step Dermagraft application procedure.

204.     Among other things, sales representatives would in some instances thaw frozen pieces of Dermagraft, rinse them in accordance with the Directions for Use, trace the border of patients' ulcers, cut pieces of Dermagraft to fit patients' ulcers, implant pieces of Dermagraft on patients' wounds, and help cover the patients' wounds with non-adherent dressing.

205.     Essentially, some sales representatives completed the providers' work for them.

206.     Indeed, this happened to Denney in February 2010. The physician was nervous and Denney demonstrated for him on a model foot how to place the Dermagraft. Denney told the physician to trace the graft with a surgical marker around the area of the wound and to cut out the graft. However, the physician could not place the graft, as a result of which Denney put on surgical gloves, took a tweezer and placed the Dermagraft in the patient's wound bed.

## B.  ABH's Violations of the Anti-Kickback Statute

### ABH Unlawfully Paid Remunerations to Healthcare Providers
### To Induce Sales of Dermagraft

207.     The federal Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms,

41

Congress enacted a prohibition against the offer or payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to over-utilization or poor quality of care.

208.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. §1320a-7b(b).

209.    Under this statute, drug companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend drugs that may be paid for by a federal health care program. *Id.*

210.    The law not only prohibits outright bribes, but also prohibits any payment by a drug company that has as one of its purposes inducement of a physician to write additional prescriptions for the company's pharmaceutical products.

211.    Such illegal inducement relationships between drug companies and physicians endanger patients and harm the federal and state treasuries because, they encourage unnecessary treatments, contaminate the free exercise of medical judgment by providers, limit patient options and lead to higher federal and state payments for prescription drug benefits. The Anti-Kickback Statute was promulgated to thwart such dangerous practice of medicine.

212.    Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

213.    In May 2003, the Inspector General of HHS released a formal Guidance identifying areas of pharmaceutical manufacturers' operations that posed potential risk of liability under several fraud and abuse statutes and regulations, including the Anti-Kickback

42

Statute. *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, 68 Fed. Reg.
23731 (May 5, 2003) (the "OIG Guidance").

214. The OIG Guidance identified in greater detail several marketing practices of drug

manufacturers that constitute "kickbacks and other illegal remuneration" affecting federal health

care programs. The OIG Guidance states:

> Any time a pharmaceutical manufacturer provides anything of
> value to a physician who might prescribe the manufacturer's
> product, the manufacturer should examine whether it is providing a
> valuable tangible benefit to the physician with the intent to induce
> or reward referrals.

*Id.* at 23737.

215. The OIG Guidance stresses that "under the anti-kickback statute, neither a

legitimate purpose for an arrangement (*e.g.*, physician education), nor a fair market value

payment, will necessarily protect remuneration if there is also an illegal purpose (i.e., the

purposeful inducement of business)." *Id.* at 23737.

216. The Anti-Kickback Statute does not draw a distinction between direct and indirect

attempts to buy influence with physicians. The Anti-Kickback Statute explicitly prohibits any

attempt, "direct or indirect," to influence a physician's prescribing practices by offering a

financial inducement or reward. 42 U.S.C. §1320a-7b(b). Buying access to physicians can be

viewed as either a direct or indirect attempt to influence prescribing practices.

217. In addition, the OIG Guidance cites the PhRMA Code[1] as a useful guide in further

interpreting the anti-kickback rules. Specifically, the OIG Guidance states that the PhRMA

---

[1] PhRMA is the Pharmaceutical Research and Manufacturers of America, a voluntary association of the
country's leading pharmaceutical companies. Effective July 1, 2002, PhRMA adopted a new marketing
code, entitled, "Code on Interactions with Healthcare Professionals" ("the PhRMA Code"). The PhRMA
Code provides guidelines for how sales representatives and others involved in marketing pharmaceuticals
should interact with healthcare professionals. The latest revisions to the PhRMA Code (effective January
2009) can be viewed at: http://www.phrma.org/sites/default/files/108/phrma_marketing_code_2008.pdf.
Cites to the PhRMA Code herein will be to the January 2009 version.

Code "provides useful and practical advice for reviewing and structuring" relationships between pharmaceutical manufacturers and providers who prescribe their drugs. *Id.* at 23737. The OIG Guidance further notes that "[a]lthough compliance with the PhRMA Code will not protect a manufacturer as a matter of law under the anti-kickback statute, it will substantially reduce the risk of fraud and abuse and help demonstrate a good faith effort to comply with the applicable federal health care program requirements." *Id.*

218.   The OIG Guidance recognizes that "[p]harmaceutical manufacturers frequently engage physicians and other health care professionals to furnish personal services as consultants or advisers . . . ." *Id.* at 23738. Accordingly, the OIG Guidance provides that it is usually permissible for a manufacturer to make "fair market value payments to small numbers of physicians for bona fide consulting or advisory services." *Id.* A key question to ask when evaluating consulting arrangements is: "Do fees for services exceed the fair market value of any legitimate, reasonable, and necessary services rendered by the physician to the manufacturer?" *Id.* at 23737.

219.   The Guidance classifies as "suspect" "[c]ompensating physicians as 'consultants' when they are expected to attend meetings or conferences primarily in a passive capacity." *Id.* (emphasis added). Physicians may not be paid to listen to marketing material, under the guise of providing "consulting" services. *Id.* at 23738. The same rule applies even if, in addition to listening to the marketing presentation, the physician is required to complete a minimal amount of paperwork. *Id.*

220.   When evaluating the validity of a consulting arrangement, the PhRMA Code provides that factors to consider include, *inter alia*, whether the consulting arrangements: (1) meet "a legitimate need" which "has been clearly identified in advance of requesting the

44

services"; (2) the venue for and nature of the meeting are "conducive to the consulting services"; (3) "activities related to the [consulting] services are the primary focus of the meeting"; and (4) "are neither inducements nor rewards for prescribing or recommending a particular course of treatment." *See* PhRMA Code at 8.

221.    Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under Federal and State-funded health care programs. With regard to Medicare and Medicaid, for example, each physician and pharmacist that participates in the programs must sign a provider agreement with his or her state. Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicare and Medicaid providers to agree that they will comply with all legal requirements, which include the anti-kickback provisions of the law. In a number of states, the Medicare and Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicare or Medicaid program, including compliance with Federal laws.

222.    Thus, either pursuant to provider agreements, claims forms, or in another appropriate manner, pharmacists and physicians who participate in a federal health care program must certify that they have complied with applicable federal rules and regulations, including the Anti-Kickback Statute.

223.    Any party convicted under the Anti-Kickback statute must be excluded (*i.e.*, not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency(ies) to exclude that provider from their State health care

program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

224. The enactment of these various provisions and amendments demonstrates Congress's commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks. Thus, compliance with the Anti-Kickback Statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicaid and other federal health care programs.

225. As a further demonstration of Congress's commitment to cut-down on the rampant fraud and abuse that plagues the federal health care programs, in March 2010, as part of the Patient Protection and Affordable Care Act of 2010 ("PPACA" or "Healthcare Reform Law"), Pub. L. No. 111-148, the Anti-Kickback Statute was amended to explicitly provide that a claim submitted for payment by the government that results from a violation of the statute constitutes a false or fraudulent claim under the False Claims Act.[2]

226. The Anti-Kickback Statute applies so long as one purpose of the remuneration was to induce further referrals.

227. ABH regularly offered and paid valuable remuneration to customers and/or potential customers of Dermagraft in order to induce additional sales of Dermagraft for both on-label and off-label uses.

---

[2] Section 6402 of PPACA provides:

(f) HEALTH CARE FRAUD.—

> (1) KICKBACKS.—Section 1128B of the Social Security Act (42 U.S.C. 1320a–7b) is amended by adding at the end the following new subsection:

> "(g) In addition to the penalties provided for in this section or section 1128A, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code."

228. ABH regularly offered and paid valuable remuneration to customers and/or potential customers of Dermagraft to encourage them to switch to Dermagraft from competitor products, including, but not limited to, an Organogenesis product called Apligraf® ("Apligraf"), which was approved by the FDA for the treatment of both DFUs and venous leg ulcers.

229. Strategies were developed with the knowledge or consent of ABH management to lure potential providers to promotional activities, including, but not limited to, expensive meals and faux medical education programs ("MEPs") conducted by and for individuals compensated by ABH for their time and travel expenses.

230. In or about November 2010, Petty arranged for a nurse practitioner from the VA Ann Arbor Healthcare System to give a presentation to clinic nurses and other providers identified as potentially significant off-label users of Dermagraft, who were flown in by ABH from around the country.

231. ABH paid the nurse practitioner $1,000 to speak at the dinner presentation, which was also paid for by ABH.

232. According to Petty, ABH chose this particular nurse practitioner because she was already an established off-label user of Dermagraft and she agreed to focus her presentation to others on potential off-label applications of Dermagraft.

233. Other speakers paid by ABH in connection with their promotion of off-label uses of Dermagraft included doctors from the Audie L. Murphy Veterans' Administration Hospital in San Antonio, Texas (the "San Antonio VA"); the Southeast VA Health Care Clinic in Phoenix, Arizona (the "Phoenix VA"); the San Francisco VA Hospital in San Francisco, California; and the Atlanta VA Medical Center in Decatur, Georgia. Some doctors were also paid by ABH for writing "sponsored" articles or case studies.

47

234.    Petty's Performance Appraisal Form for the 2010 review period indicates that one doctor from Duke's Plastic Surgery department may also have been paid for a "talk in support of [Dermagraft]" and also sought to attend a 2011 "physician's meeting" at ABH's manufacturing facility in La Jolla, California, which would have been paid for by ABH.

235.    In general, ABH did not hire speakers who did not themselves purchase significant amounts of Dermagraft for off-label use.

236.    ABH sales representatives also had fixed marketing budgets of approximately $5,500 to $6,000 per month ($66,000 to $72,000 annually), which were used mostly for taking current or potential customers to expensive lunches and dinners in an effort to increase sales of Dermagraft units.

237.    Although ABH's "official" policy limited the amount of money that could be spent for any one person per meal to $100, management knew of and encouraged sales representatives to falsify their expense reports so that their expenditures appeared compliant with the ABH policy.

238.    By way of example, if a sales representative took two doctors to dinner and the bill came to $700, then the sales representative would simply claim on his or her expense report that seven doctors attended the dinner so that the total would fall under the $100 per person limit. Upon information and belief, about eighty percent (80%) of all expense reports submitted for meals were manipulated in this way.

239.    ABH management allowed and facilitated excessive spending by sales representatives by seeking as little detail as possible regarding sales representatives' expenses and claims for reimbursement.

48

240.    Among others, Lex Harris explicitly instructed Petty and others to manipulate their expense reports in this way.

241.    On three or four occasions, Lex Harris also attended meals with Petty, which were ultimately subjects of a falsified expense reports approved by Harris himself.

242.    During a telephone conversation in or about July 2011, one sales representative told Petty that another sales representative used a portion of his monthly marketing budget to purchase gold krugerrands – South African gold coins worth approximately $1,500 to $2,000 each – which he would then give to a doctor at the San Antonio VA in exchange for orders of Dermagraft units.

243.    ABH pays incentives to physicians and to members of the physicians' staffs in order to "reward" the physicians and their staff members for ordering Dermagraft.  ABH's training materials for the Rallo Method repeatedly instruct sales agents to "reward" the doctor and staff members.

244.    Physicians are given trips to ABH's facility in La Jolla, California for "Advisory Board Training" which are known within ABH to be "dog and pony shows" designed to allow the physicians to play golf at Torrey Pines, just down the road from ABH's facility, to enjoy "business" dinners and lunches and otherwise to enjoy San Diego.

245.    Physicians and members of their staffs are treated to "[g]ift cards, lunches, dinners, sporting events and hunting."

246.    When sales agents cannot visit a wound clinic, ABH sends catered breakfasts or lunches to the clinic for the entire staff and puts Dermagraft stickers on the boxes to ensure that everyone knows who the generous donor is.

49

247. Physicians are invited to become speakers and part of the speakers program. Physicians are reimbursed handsomely for speaking, often even if they never speak. In fact, each physician is paid $1,500.00 just for his or her training plus all expenses.

248. ABH ran "nurses night out" for nurses at physicians' offices, because "if you can get your nurses out, you can create DG [Dermagraft] advocates more quickly."

249. ABH sales representatives were instructed to schedule and hold "SOC Dinners" with the staff of physicians' offices. For example, Richardson was praised for holding "a great dinner with St. Luke's clinic. The 'total clinic' SOC dinner is the way to go. You get a chance to sell everyone! If you have not held one in your franchise yet, set it up and let's make it happen."

250. The only reason ABH paid these various types of remuneration to physicians and the staff of physicians' offices was to induce the physicians to use Dermagraft both on and off label.

251. Sales representatives similarly provided customers and/or potential customers with other types of gifts of substantial value.

252. To obtain reimbursement for such "expenses," some sales representatives created fake catering invoices to make it appear that the money was spent on legitimate sales breakfasts and lunches.

253. Because Dermagraft needs to be frozen prior to use, ABH further provided freezers to customers in exchange for purchases of large quantities of the product.

254. The freezers were valued at approximately $5,949.96 each and were provided to customers under a "loan agreement" on a year-by-year basis, which allowed ABH to regularly "re-evaluate the need for the Equipment at the Facility."

50

255.    In exchange for use of the freezers, customers agreed to a minimum initial order of at least five (5) pieces of Dermagraft, as well as a minimum of five (5) pieces of Dermagraft for each subsequent order.

256.    ABH made a significant effort to offer or to provide the benefit of the freezers to its larger customers or potential customers.

257.    ABH also made a significant effort to alleviate any concerns regarding the propriety or legality of offering or providing the benefits of the freezers to its larger customers or potential customers.

258.    In or about May 2011, the Logistics Department at the Fayetteville North Carolina VA expressed its concern that the facility's receipt of the freezer was "illegal." In response, a Vice President of Sales at ABH sent an e-mail to Petty telling him to make sure that the freezer was removed immediately. It was Petty's understanding that ABH wanted this issue resolved quickly so that the issue would not become known to other VA providers.

259.    ABH similarly offered to send certain customers or potential customers "a limited quantity of Ossur® DH Offloading Walkers ('Walkers') at no charge" in an attempt to increase sales of Dermagraft. The Walkers are cast-like boots with insoles designed to relieve pressure on foot ulcers in patients. However, the Walkers are very difficult to put on and take off, as a result of which ABH sales representatives were required to teach the patients of the customers who received the Walkers how to put the Walkers on and to take the Walkers off.

260.    In or about August 2011, ABH also made a "three-year commitment of $50,000 per year to the Phoenix VA in the form of an "unrestricted research grant".

261.    Upon information and belief, while the commitment made by ABH to the Phoenix VA was called a "research grant . . . in support of Podiatric Research," the monies paid were

51

actually used to fund a resident's salary and were paid as *quid pro quo* for the millions of dollars in sales of Dermagraft made to the Phoenix VA through one or more of its doctors.

### *ABH Filed and Caused Others to File False and/or Fraudulent Compliance Certifications*

262.     In light of the foregoing, both ABH and the healthcare providers who accepted unlawful remuneration from ABH – *i.e.*, the kickback recipients – have filed false and/or fraudulent certifications in connection with their participation in various Government Health Programs and in furtherance of receiving payments or reimbursements thereunder.

263.     As Medicare providers, ABH and the kickback recipients were required to enter into provider agreements with the Government pursuant to which they certified that they would comply with all laws and regulations concerning proper practices for Medicare providers, including, but not limited to, the Anti-Kickback Statute.

264.     Such compliance with federal health care laws, including the Anti-Kickback Statute, is a generally a precondition condition of payment or reimbursement by Medicare.

265.     ABH has presented, made, used or caused to be presented, made, or used, hundreds (if not thousands) of False Claims in violation of the FCA and the State Acts.

### C. **ABH's Deceptive and Improper Billing Practices**

266.     During the relevant period, ABH engaged in a pattern and practice of improperly billing Government Health Programs for unused units of Dermagraft.

267.     While Government Health Programs typically pay or reimburse ABH or healthcare providers for up to eight units of Dermagraft per patient, many patients heal prior to the application of all eight units.

268.     Upon information and belief, ABH regularly and routinely billed, and continues to bill, Government Health Programs for a total of eight units of Dermagraft even for those

52

patients who heal prior to the application of all eight units.

269.    This practice reflects a direct attempt by ABH to maximize and capture the total amount of money paid by Government Health Programs for Dermagraft, regardless of the medical need of the patient being treated and/or whether the product was actually used on the patient.

### D.  ABH's Unlawful Sales Practices Harmed Patients

270.    ABH's unlawful marketing and promotion of Dermagraft has led to some instances of serious patient harm.

271.    In one case, Dermagraft was used off-label to treat a wound on the leg of a middle-aged man who received several applications of Dermagraft at the Durham VA in or about early 2011.

272.    Because Dermagraft was not approved and/or appropriate to treat the patient's specific condition, the wound did not heal properly and led to an infection.

273.    Ultimately, in or about August 2011, the patient's leg was amputated as a result.

274.    The off-label use of Dermagraft has also led to infections in numerous other patients.

275.    Some patients have also experienced prolonged pain and suffering and have needed to undergo extended care as a result of Dermagraft being used where it is medically unnecessary, contraindicated and/or otherwise inappropriate.

### E.  Shire's Continuing Conduct

276.    The conduct of ABH described herein continued even after ABH was acquired by Shire plc and Shire Pharmaceuticals on June 28, 2011 pursuant to a merger.

277.    Moreover, after June 28, 2011, Shire plc and/or Shire Pharmaceuticals exercised

53

complete domination and control over ABH such that ABH's separate entity was largely ignored ABH could be called an alter-ego of Shire plc and/or Shire Pharmaceuticals.

278.    On or about July 19, 2012, Advanced BioHealing, Inc. officially changed its name to Shire Regenerative Medicine, Inc.

## DAMAGES SUSTAINED BY THE GOVERNMENT AS A RESULT OF DEFENDANTS' CONDUCT

279.    Defendants' off-label marketing efforts, illegal kickback scheme, and improper billing practices (including the conduct set forth above) have been pervasive, occurring in all of ABH's sales territories throughout the United States.

280.    Due predominantly to Defendants' off-label marketing efforts, illegal kickback scheme, and improper billing practices (including the conduct set forth above), sales of Dermagraft have substantially increased since ABH first introduced the device in February 2007.

281.    In 2010, ABH's sales of Dermagraft reached approximately $147 million.

282.    During the approximately seven months from the time that Shire plc and Shire Pharmaceuticals acquired ABH in June 2011 through December 31, 2011, total product sales of Dermagraft were approximately $105 million.

283.    Upon information and belief, sales of Dermagraft for the entire year of 2011 exceeded $150 million.

284.    Upon information and belief, between thirty percent (30%) and forty percent (40%) of all sales of Dermagraft are attributable to off-label uses.

285.    In 2010, ABH's sales of Dermagraft to Government-operated facilities, such as VA hospitals, totaled approximately $34 million.

286.    Sales of Dermagraft to Government-operated facilities, such as VA hospitals, are generally paid for through a national budget under the prosthetics department.

54

287.    Government Health Programs, such as Medicare and Medicaid, also reimburse Government-operated facilities, such as VA hospitals, for a significant portion of Dermagraft units purchased and used.

288.    The United States and the State Plaintiffs have been directly damaged by Defendants' misconduct.

289.    Defendants repeatedly and consistently submitted False Claims to Government Health Programs in violation of federal and state law, including, but not limited to, the FCA and the State Acts, in connection with sales of Dermagraft.

290.    Defendants' False Claims were made, used, presented, or caused to be made, used or presented, with the intent to gain an unfair economic benefit at the expense of Government Health Programs and law-abiding taxpayers.

291.    Government Health Programs, including, but not limited to, Medicare and Medicaid, reasonably relied upon the False Claims by Defendants to their detriment.

292.    Had the Government been aware of Defendants' unlawful practices and methodologies, the False Claims submitted by Defendants would not have been paid.

### ABH WRONGFULLY TERMINATED PETTY'S EMPLOYMENT

293.    During the course of his employment at ABH, Petty continually questioned the legality of the company's marketing and sales practices.

294.    As a result of not fully participating in ABH's off-label marketing efforts, illegal kickback scheme, and various other schemes, Petty was placed on a "performance plan" in or about October 2010.

295.    Ultimately, ABH terminated Petty on September 30, 2011 purportedly for his failure to meet monthly sales quotas.

296.    Since leaving ABH, Petty suffered and continues to suffer substantial financial harm.

297.    Although Petty has attempted to mitigate his damages by seeking and securing alternative employment, his compensation has been significantly lower than it was while employed by ABH.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)**
**(As to all Defendants)**

298.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

299.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

300.    As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**(As to all Defendants)**

301.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

302.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for

payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

303. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
#### Federal False Claims Act
#### 31 U.S.C. § 3729(a)(2)
#### (As to all Defendants)

304. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

305. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2).

306. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
#### Federal False Claims Act
#### 31 U.S.C. § 3729(a)(1)(B)
#### (As to all Defendants)

307. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

308. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims within the meaning of 31 U.S.C. § 3729(a)(1)(B).

309. As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(3)
### (As to all Defendants)

310.   Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

311.   Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid to in violation of 31 U.S.C. § 3729(a)(3).

312.   As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)
### (As to all Defendants)

313.   Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

314.   Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to commit violations of the FCA within the meaning of 31 U.S.C. § 3729(a)(1)(C).

315.   As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(7)
### (As to all Defendants)

316.   Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

58

317.   Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease their obligations to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(7).

318.   As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**(As to all Defendants)**

319.   Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

320.   Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used, false records or statements material to its obligations to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased their obligations to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

321.   As a result of Defendants' conduct, the United States has been damaged in an amount to be proven at trial.

### NINTH CAUSE OF ACTION
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(D)**
**(As to all Defendants)**

322.   Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

59

323.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants possessed or controlled property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that property or money within the meaning of 31 U.S.C. § 3729(a)(1)(D).

324.    As a result of Defendants' conduct the United States has been damaged in an amount to be proven at trial.

### TENTH CAUSE OF ACTION
### Federal False Claims Act
### 31 U.S.C. § 3730(h)
### (As to all Defendants)

325.    Relators repeat and incorporate by reference the allegations contained in foregoing paragraphs of the Complaint as if fully set forth herein.

326.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants discharged, threatened, harassed and/or discriminated against Petty in the terms and conditions of his employment after Petty lawfully reported what he believed to be fraudulent conduct or wrongdoing to her superiors in violation of 31 U.S.C. 3730(h).

### ELEVENTH CAUSE OF ACTION
### Federal Anti-Kickback Statute
### 42 U.S.C. § 1320a-7b(b)
### (As to all Defendants)

327.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

328.    Defendants knowingly and willfully paid or offered to pay valuable remuneration, including kickbacks and bribes, in cash or in kind to numerous physicians and other healthcare providers for the purpose of those physicians and healthcare providers to refer or recommend the furnishing of Dermagraft for patients.

329.     Defendants knowingly and willfully paid or offered to pay valuable remuneration, including kickbacks and bribes, in cash or in kind to numerous physicians and other healthcare providers for the purpose of inducing those physicians and healthcare providers to purchase, order, or arrange for or recommend purchasing or ordering of, Dermagraft.

330.     Payment for Dermagraft may be made in whole or in part under federal health care programs, including, but not limited to, Medicare.

331.     As a result of Defendants' conduct, the United States has been damaged, and continues to be damaged, in an amount to be determined at trial.

### TWELFTH CAUSE OF ACTION
#### California False Claims Act
#### Cal. Gov't Code §§ 12651(a)(1), (2), (3) and (7)
#### (As to all Defendants)

332.     Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

333.     This is a claim for treble damages and penalties under the CA FCA.

334.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the California State Government for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

335.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay false and fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

336.     Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the California State Government by inducing it to approve and

pay false and fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(3).

337. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the California State Government, in violation of Cal. Gov't Code § 12651(a)(7).

338. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

339. As a result of Defendants' conduct, the State of California has been damaged, and continues to be damaged, in an amount to be determined at trial.

340. The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## THIRTEENTH CAUSE OF ACTION
### Colorado Medicaid False Claims Act
### Colo. Rev. Stat. §§ 25.5-4-305(a), (b), (f) and (g)
### (As to All Defendants)

341. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

342. This is a claim for treble damages and penalties under the CO MFCA.

343. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Colorado State Government for payment or approval, in violation of Colo. Rev. Stat § 25.5-4-305(a).

344. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay false and fraudulent claims, in violation of Colo. Rev. Stat § 25.5-4-305(b).

345. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Colorado State Government by inducing it to approve and pay false and fraudulent claims, in violation of Colo. Rev. Stat § 25.5-4-305(g).

346. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Colorado State Government, in violation of Colo. Rev. Stat § 25.5-4-305(f).

347. The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

348. As a result of Defendants' conduct, the State of Colorado has been damaged, and continues to be damaged, in an amount to be determined at trial.

349. The State of Colorado is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## FOURTEENTH CAUSE OF ACTION
### Connecticut False Claims Act
### Conn. Gen. Stat. §§ 17b-301b(a)(1), (2), (3) and (7)
### (As to All Defendants)

350. Relators repeat and incorporate by reference the allegations contained in the

63

foregoing paragraphs of this Complaint as if fully set forth herein.

351.    This is a claim for treble damages and penalties under the CT FCA.

352.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Connecticut State Government for payment or approval, in violation of Conn. Gen. Stat. § 17b-301b(a)(1).

353.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay false and fraudulent claims, in violation of Conn. Gen. Stat. § 17b-301b(a)(2).

354.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Connecticut State Government by inducing it to approve and pay false and fraudulent claims, in violation of Conn. Gen. Stat. § 17b-301b(a)(3).

355.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Connecticut State Government, in violation of Conn. Gen. Stat. § 17b-301b(a)(7).

356.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

357.    As a result of Defendants' conduct, the State of Connecticut has been damaged, and continues to be damaged, in an amount to be determined at trial.

64

358.    The State of Connecticut is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**FIFTEENTH CAUSE OF ACTION**
**Delaware False Claims And Reporting Act**
**Del. Code Ann tit. 6, §§ 1201(a)(1), (2), (3) and (7)**
**(As to All Defendants)**

359.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

360.    This is a claim for treble damages and penalties under the DE FCA.

361.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Delaware State Government for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

362.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay false and fraudulent claims, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

363.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Delaware State Government by inducing it to approve and pay false and fraudulent claims, in violation of Del. Code Ann. tit. 6, § 1201(a)(3).

364.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Delaware State Government, in violation of Del. Code Ann. tit. 6, § 1201(a)(7).

65

365.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

366.    As a result of Defendants' conduct, the State of Delaware has been damaged, and continues to be damaged, in an amount to be determined at trial.

367.    The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## SIXTEENTH CAUSE OF ACTION
### District of Columbia Procurement Reform Act
### D.C. Stat. § 2-308.14(a)(1), (2), (3) and (7)
### (As to All Defendants)

368.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

369.    This is a claim for treble damages and penalties under the DC FCA.

370.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the District of Columbia for payment or approval, in violation of D.C. Stat. § 2-308.14(a)(1).

371.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia to approve and pay false and fraudulent claims, in violation of D.C. Stat. § 2-308.14(a)(2).

372.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the District of Columbia by inducing it to approve and pay false

66

and fraudulent claims, in violation of D.C. Stat. § 2-308.14(a)(3).

373. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the District of Columbia, in violation of D.C. Stat. § 2-308.14(a)(7).

374. The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme

375. As a result of Defendants' conduct, the District of Columbia has been damaged, and continues to be damaged, in an amount to be determined at trial.

376. The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## SEVENTEENTH CAUSE OF ACTION
### Florida False Claims Act
### Fla. Stat. Ann. §§ 68.082(2)(a), (b), (c) and (g)
### (As to All Defendants)

377. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

378. This is a claim for treble damages and penalties under the FL FCA.

379. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Florida State Government for payment or approval, in violation of Fla. Stat. Ann. § 68.082(2)(a).

380. Through the acts more particularly set forth in the foregoing paragraphs,

67

Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay false and fraudulent claims, in violation of Fla. Stat. Ann. § 68.082(2)(b).

381. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Florida State Government by inducing it to approve and pay false and fraudulent claims, in violation of Fla. Stat. Ann. § 68.082(2)(c).

382. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Florida State Government, in violation of Fla. Stat. Ann. § 68.082(2)(g).

383. The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

384. As a result of Defendants' conduct, the State of Florida has been damaged, and continues to be damaged, in an amount to be determined at trial.

385. The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## EIGHTEENTH CAUSE OF ACTION
### Georgia False Medicaid Claims Act
### Ga. Code Ann. §§ 49-4-168.1(a)(1), (2), (3) and (7)
### (As to All Defendants)

386. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

68

387. This is a claim for treble damages and penalties under the GA MFCA.

388. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Georgia State Government for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

389. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay false and fraudulent claims, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

390. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Georgia State Government by inducing it to approve and pay false and fraudulent claims, in violation of Ga. Code Ann. § 49-4-168.1(a)(3).

391. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Georgia State Government, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

392. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

393. As a result of Defendants' conduct, the State of Georgia has been damaged, and continues to be damaged, in an amount to be determined at trial.

394. The State of Georgia is entitled to the maximum penalty of $11,000 for each and

every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## NINETEENTH CAUSE OF ACTION
### Hawaii False Claims Act
### Haw. Rev. Stat. §§ 661-21(a)(1), (2), (3) and (7)
### (As to All Defendants)

395. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

396. This is a claim for treble damages and penalties under the HI FCA.

397. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Hawaii State Government for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(1).

398. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay false and fraudulent claims, in violation of Haw. Rev. Stat. § 661-21(a)(2).

399. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Hawaii State Government by inducing it to approve and pay false and fraudulent claims, in violation of Haw. Rev. Stat. § 661-21(a)(3).

400. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Hawaii State Government, in violation of Haw. Rev. Stat. § 661-21(a)(7).

401. The Hawaii State Government, unaware of the falsity of the records, statements

70

and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

402. As a result of Defendants' conduct, the State of Hawaii has been damaged, and continues to be damaged, in an amount to be determined at trial.

403. The State of Hawaii is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTIETH CAUSE OF ACTION
### Illinois Whistleblower Reward And Protection Act
### 740 Ill. Comp. Stat. §§ 175/3(a)(1), (2), (3) and (7)
### (As to All Defendants)

404. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

405. This is a claim for treble damages and penalties under the IL FCA.

406. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Illinois State Government for payment or approval, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1).

407. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay false and fraudulent claims, in violation of 740 Ill. Comp. Stat. § 175/3(a)(2).

408. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Illinois State Government by inducing it to approve and pay

71

false and fraudulent claims, in violation of 740 Ill. Comp. Stat. § 175/3(a)(3).

409. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Illinois State Government, in violation of 740 Ill. Comp. Stat. § 175/3(a)(7).

410. The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

411. As a result of Defendants' conduct, the State of Illinois has been damaged, and continues to be damaged, in an amount to be determined at trial.

412. The State of Illinois is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-FIRST CAUSE OF ACTION
### Indiana False Claims and Whistleblower Protection Act
### Ind. Code §§ 5-11-5.5-2(b)(1), (2), (6) and (7)
### (As to All Defendants)

413. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

414. This is a claim for treble damages and penalties under the IN FCA.

415. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Indiana State Government for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(1).

416. Through the acts more particularly set forth in the foregoing paragraphs,

72

Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay false and fraudulent claims, in violation of Ind. Code § 5-11-5.5-2(b)(2).

417. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Indiana State Government by inducing it to approve and pay false and fraudulent claims, in violation of Ind. Code § 5-11-5.5-2(b)(7).

418. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Indiana State Government, in violation of Ind. Code § 5-11-5.5-2(b)(6).

419. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

420. As a result of Defendants' conduct, the State of Indiana has been damaged, and continues to be damaged, in an amount to be determined at trial.

421. The State of Indiana is entitled to the maximum penalty of at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-SECOND CAUSE OF ACTION

### Iowa Medicaid False Claims Act
### Iowa Code Ann. § 685.2(1)(a), (b), (c) and (g)
### (As to All Defendants)

422. Relators repeat and incorporate by reference the allegations contained in the

73

foregoing paragraphs of this Complaint as if fully set forth herein.

423.    This is a claim for treble damages and penalties under the IA MFCA.

424.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Iowa State Government for payment or approval, in violation of Iowa Code Ann. § 685.2(1)(a).

425.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay false and fraudulent claims, in violation of Iowa Code Ann. § 685.2(1)(b).

426.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Iowa State Government by inducing it to approve and pay false and fraudulent claims, in violation of Iowa Code Ann. § 685.2(1)(c).

427.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Iowa State Government, in violation of Iowa Code Ann. § 685.2(1)(g).

428.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

429.    As a result of Defendants' conduct, the State of Iowa has been damaged, and continues to be damaged, in an amount to be determined at trial.

430.    The State of Iowa is entitled to the maximum penalty of at least $5,000 for each

74

and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-THIRD CAUSE OF ACTION
### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. Ann. §§ 438.3(A), (B), (C) and (D)
### (As to All Defendants)

431.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

432.    This is a claim for treble damages and penalties under the LA MFCA.

433.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Louisiana State Government for payment or approval, in violation of La. Rev. Stat. Ann. § 438.3(A).

434.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay false and fraudulent claims, in violation of La. Rev. Stat. Ann. § 438.3(B).

435.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Louisiana State Government by inducing it to approve and pay false and fraudulent claims, in violation of La. Rev. Stat. Ann. § 438.3(D).

436.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Louisiana State Government, in violation of La. Rev. Stat. Ann. § 438.3(C).

437.    The Louisiana State Government, unaware of the falsity of the records, statements

75

and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

438. As a result of Defendants' conduct, the State of Louisiana has been damaged, and continues to be damaged, in an amount to be determined at trial.

439. The State of Louisiana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY-FOURTH CAUSE OF ACTION
### Maryland False Health Claims Act of 2010
### Md. Code Ann., Health §§ 2-602(A)(1), (2), (3), (7), (8) and (9)
### (As to All Defendants)

440. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

441. This is a claim for treble damages and penalties under the MD FHCA.

442. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Maryland State Government for payment or approval, in violation of Md. Code Ann., Health §§ 2-602(A)(1) and (8).

443. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay false and fraudulent claims, in violation of Md. Code Ann., Health § 2-602(A)(2).

444. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Maryland State Government by inducing it to approve and

76

pay false and fraudulent claims, in violation of Md. Code Ann., Health § 2-602(A)(3).

445.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the Maryland State Government, in violation of Md. Code Ann., Health § 2-602(A)(7).

446.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly and improperly concealed, avoided or decreased obligations to pay or transmit money or property to the Maryland State Government, in violation of Md. Code Ann., Health § 2-602(A)(8).

447.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

448.    As a result of Defendants' conduct, the State of Maryland has been damaged, and continues to be damaged, in an amount to be determined at trial.

449.    The State of Maryland is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### TWENTY-FIFTH CAUSE OF ACTION
#### Massachusetts False Claims Act
#### Mass. Gen. Laws ch. 12, §§ 5B(1), (2), (3) and (8)
#### (As to All Defendants)

450.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

451.    This is a claim for treble damages and penalties under the MA FCA.

77

452.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Massachusetts State Government for payment or approval, in violation of Mass. Gen. Laws ch. 12, § 5B(1).

453.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay false and fraudulent claims, in violation of Mass. Gen. Laws ch. 12, § 5B(2).

454.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Massachusetts State Government by inducing it to approve and pay false and fraudulent claims, in violation of Mass. Gen. Laws ch. 12, § 5B(3).

455.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Massachusetts State Government, in violation of Mass. Gen. Laws ch. 12, § 5B(8).

456.    The Massachusetts Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

457.    As a result of Defendants' conduct, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in an amount to be determined at trial.

458.    The Commonwealth of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented

or caused to be made, used or presented by Defendants.

### TWENTY-SIXTH CAUSE OF ACTION
### Michigan Medicaid False Claims Act
### Mich. Comp. Laws §§ 400.606-07
### (As to All Defendants)

459.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

460.    This is a claim for damages and penalties under the MI FCA.

461.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Michigan State Government by inducing it to approve and pay false and fraudulent claims, in violation of Mich. Comp. Laws § 400.606.

462.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made or presented, or caused to be made or presented, false or fraudulent claims to the Michigan State Government for payment or approval, in violation of Mich. Comp. Laws § 400.607.

463.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

464.    As a result of Defendants' conduct, the State of Michigan has been damaged, and continues to be damaged, in an amount to be determined at trial.

465.    The State of Michigan is entitled to the maximum penalty of $50,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### TWENTY-SEVENTH CAUSE OF ACTION
**Minnesota False Claims Act**
**Minn. Stat. §§ 15C.02(a)(1), (2), (3) and (7)**
**(As to All Defendants)**

466.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

467.    This is a claim for treble damages and penalties under the MN FCA.

468.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Minnesota State Government for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

469.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay false and fraudulent claims, in violation of Minn. Stat. § 15C.02(a)(2).

470.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Minnesota State Government by inducing it to approve and pay false and fraudulent claims, in violation of Minn. Stat. § 15C.02(a)(3).

471.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the Minnesota State Government, in violation of Minn. Stat. § 15C.02(a)(7).

472.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

473.    As a result of Defendants' conduct, the State of Minnesota has been damaged, and continues to be damaged, in an amount to be determined at trial.

474.    The State of Minnesota is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### TWENTY-EIGHTH CAUSE OF ACTION
Montana False Claims Act
Mont. Code Ann. §§ 17-8-403(1)(a), (b), (c) and (g)
(As to All Defendants)

475.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

476.    This is a claim for treble damages and penalties under the MT FCA.

477.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Montana State Government for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

478.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay false and fraudulent claims, in violation of Mont. Code Ann. § 17-8-403(1)(b).

479.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Montana State Government by inducing it to approve and pay false and fraudulent claims, in violation of Mont. Code Ann. § 17-8-403(1)(c).

480.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements

81

material to obligations to pay or transmit money or property to the Montana State Government, in violation of Mont. Code Ann. § 17-8-403(1)(g).

481.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

482.    As a result of Defendants' conduct, the State of Montana has been damaged, and continues to be damaged, in an amount to be determined at trial.

483.    The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### TWENTY-NINTH CAUSE OF ACTION
#### Nevada False Claims Act
#### Nev. Rev. Stat. §§ 357.040(1)(a), (b), (c) and (g)
#### (As to All Defendants)

484.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

485.    This is a claim for treble damages and penalties under the NV FCA.

486.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Nevada State Government for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

487.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay false and

82

fraudulent claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

488.  Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Nevada State Government by inducing it to approve and pay false and fraudulent claims, in violation of Nev. Rev. Stat. § 357.040(1)(c).

489.  Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the Nevada State Government, in violation of Nev. Rev. Stat. § 357.040(1)(g).

490.  The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

491.  As a result of Defendants' conduct, the State of Nevada has been damaged, and continues to be damaged, in an amount to be determined at trial.

492.  The State of Nevada is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### THIRTIETH CAUSE OF ACTION
#### New Hampshire False Claims Act
#### N.H. Rev. Stat. Ann. §§ 167:61-b(I)(a), (b), (c) and (e)
#### (As to All Defendants)

493.  Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

494.  This is a claim for treble damages and penalties under the NH FCA.

495.  Through the acts more particularly set forth in the foregoing paragraphs,

Defendants knowingly presented or caused to be presented false or fraudulent claims to the New Hampshire State Government for payment or approval, in violation of N.H. Rev. Stat. Rev. Stat. Ann. § 167:61-b(I)(a).

496. Through the acts more particularly set forth in the foregoing paragraphs, Defendants made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay false and fraudulent claims, in violation of N.H. Rev. Stat. Rev. Stat. Ann. § 167:61-b(I)(b).

497. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the New Hampshire State Government by inducing it to approve and pay false and fraudulent claims, in violation of N.H. Rev. Stat. Rev. Stat. Ann. § 167:61-b(I)(c).

498. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the New Hampshire State Government, in violation of N.H. Rev. Stat. Rev. Stat. Ann. § 167:61-b(I)(e).

499. The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

500. As a result of Defendants' conduct, the State of New Hampshire has been damaged, and continues to be damaged, in an amount to be determined at trial.

501. The State of New Hampshire is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to

84

be made, used or presented by Defendants.

## THIRTY-FIRST CAUSE OF ACTION
### New Jersey False Claims Act
### N.J. Stat. Ann. §§ 2A:32C-3(a), (b), (c) and (g)
### (As to All Defendants)

502.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

503.    This is a claim for treble damages and penalties under the NJ FCA.

504.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the New Jersey State Government for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

505.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay false and fraudulent claims, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

506.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the New Jersey State Government by inducing it to approve and pay false and fraudulent claims, in violation of N.J. Stat. Ann. § 2A:32C-3(c).

507.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the New Jersey State Government, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

508.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants'

illegal and hidden marketing and kickback scheme.

509.    As a result of Defendants' conduct, the State of New Jersey has been damaged, and continues to be damaged, in an amount to be determined at trial.

510.    The State of New Jersey is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**THIRTY-SECOND CAUSE OF ACTION**
**New Mexico Medicaid False Claims Act**
**N.M. Stat. Ann. §§ 27-14-4(A), (C), (D), and (E)**
**(As to All Defendants)**

511.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

512.    This is a claim for treble damages under the NM MFCA.

513.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the New Mexico State Government for payment or approval, in violation of N.M. Stat. Ann. § 27-14-4(A).

514.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay false and fraudulent claims, in violation of N.M. Stat. Ann. § 27-14-4(C).

515.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the New Mexico State Government by inducing it to approve and pay false and fraudulent claims, in violation of N.M. Stat. Ann. § 27-14-4(D).

516.    Through the acts more particularly set forth in the foregoing paragraphs,

Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the New Mexico State Government, in violation of N.M. Stat. Ann. § 27-14-4(E).

517. The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

518. As a result of Defendants' conduct, the State of New Mexico has been damaged, and continues to be damaged, in an amount to be determined at trial.

### THIRTY-THIRD CAUSE OF ACTION
### New York False Claims Act
### N.Y. State Fin. §§ 189(1)(a), (b), (c) and (g)
### (As to All Defendants)

519. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

520. This is a claim for treble damages and penalties under the NY FCA.

521. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the New York State Government for payment or approval, in violation of N.Y. State Fin. § 189(1)(a).

522. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay false and fraudulent claims, in violation of N.Y. State Fin. § 189(1)(b).

523. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the New York State Government by inducing it to approve and

87

pay false and fraudulent claims, in violation of N.Y. State Fin. § 189(1)(c).

524. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the New York State Government, in violation of N.Y. State Fin. § 189(1)(g).

525. The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

526. As a result of Defendants' conduct, the State of New York has been damaged, and continues to be damaged, in an amount to be determined at trial.

527. The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**THIRTY-FOURTH CAUSE OF ACTION**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-607(a)(1), (2), (3) and (7)**
**(As to All Defendants)**

528. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

529. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

530. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the North Carolina State Government for payment or approval, in violation of N.C. Gen. Stat. § 1-

88

607(a)(1).

531.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay false and fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

532.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the North Carolina State Government by inducing it to approve and pay false and fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(3).

533.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the North Carolina State Government, in violation of N.C. Gen. Stat. § 1-607(a)(7).

534.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

535.    As a result of Defendants' conduct, the State of North Carolina has been damaged, and continues to be damaged, in an amount to be determined at trial.

536.    The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

89

## THIRTY-FIFTH CAUSE OF ACTION
### Oklahoma Medicaid False Claims Act
### Ok. Stat. tit. 63, §§ 5053.1(B)(1), (2), (3) and (7)
### (As to All Defendants)

537.   Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

538.   This is a claim for treble damages and penalties under the OK MFCA.

539.   Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Oklahoma State Government for payment or approval, in violation of Ok. Stat. tit. 63, § 5053.1(B)(1).

540.   Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay false and fraudulent claims, in violation of Ok. Stat. tit. 63, § 5053.1(B)(2).

541.   Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Oklahoma State Government by inducing it to approve and pay false and fraudulent claims, in violation of Ok. Stat. tit. 63, § 5053.1(B)(3).

542.   Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material obligations to pay or transmit money or property to the Oklahoma State Government, in violation of Ok. Stat. tit. 63, § 5053.1(B)(7).

543.   The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants'

90

illegal and hidden marketing and kickback scheme.

544. As a result of Defendants' conduct, the State of Oklahoma has been damaged, and continues to be damaged, in an amount to be determined at trial.

545. The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## THIRTY-SIXTH CAUSE OF ACTION
### Rhode Island False Claims Act
### R.I. Gen. Laws §§ 9-1.1-3(a)(1), (2), (3) and (7)
### (As to All Defendants)

546. Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

547. This is a claim for treble damages and penalties under the RI FCA.

548. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Rhode Island State Government for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

549. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay false and fraudulent claims, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

550. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Rhode Island State Government by inducing it to approve and pay false and fraudulent claims, in violation of R.I. Gen. Laws § 9-1.1-3(a)(3).

551. Through the acts more particularly set forth in the foregoing paragraphs,

Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the Rhode Island State Government, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

552.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

553.    As a result of Defendants' conduct, the State of Rhode Island has been damaged, and continues to be damaged, in an amount to be determined at trial.

554.    The State of Rhode Island is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**THIRTY-SEVENTH CAUSE OF ACTION**
**Tennessee False Claims Act**
**Tenn. Code Ann. §§ 71-5-182(a)(1)(A)-(D)**
**(As to All Defendants)**

555.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

556.    This is a claim for treble damages and penalties under the TN MFCA.

557.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Tennessee State Government for payment or approval, under the Medicaid program, in violation of Tenn. Code Ann. § 71-5-185(a)(1)(A).

558.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements,

and omitted material facts, to induce the Tennessee State Government to approve and pay false and fraudulent claims, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

559.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Tennessee State Government by inducing it to approve and pay false and fraudulent claims, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(C).

560.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the Tennessee State Government, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

561.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

562.    As a result of Defendants' conduct, the State of Tennessee has been damaged, and continues to be damaged, in an amount to be determined at trial.

563.    The State of Tennessee is entitled to the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### THIRTY-EIGHTH CAUSE OF ACTION
#### Texas Medicaid Fraud Prevention Law
#### Tex. Hum. Res. Code Ann. §§ 36.002(1), (2), (5) and (9)
#### (As to All Defendants)

564.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

565.    This is a claim for double damages and penalties under the TX MFCA.

566.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made or caused to be made false statements of material fact, in order to receive benefits unauthorized under the Texas Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

567.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly concealed or failed to disclose information, in order to receive benefits unauthorized under the Texas Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

568.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly paid unlawful kickbacks and other consideration in violation of Tex. Hum. Res. Code Ann. § 36.002(5).

569.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly conspired to defraud the Texas State Government by inducing it to approve and pay false and fraudulent claims, in violation of Tex. Hum. Res. Code Ann. § 36.002(9).

570.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

571.    As a result of Defendants' conduct, the State of Texas has been damaged, and continues to be damaged, in an amount to be determined at trial.

572.    The State of Texas is entitled to the maximum penalty of $10,000 for each and

94

every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### THIRTY-NINTH CAUSE OF ACTION
#### Virginia Fraud Against Taxpayers Act
#### Va. Code Ann. §§ 8.01-216.3(a)(1), (2), (3) and (7)
#### (As to All Defendants)

573.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

574.    This is a claim for treble damages and penalties under the VA FCA.

575.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Virginia Commonwealth Government for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(a)(1).

576.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia Commonwealth Government to approve and pay false and fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(a)(2).

577.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Virginia Commonwealth Government by inducing it to approve and pay false and fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(a)(3).

578.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the Virginia Commonwealth Government, in violation of Va. Code Ann. § 8.01-216.3(a)(7).

579.    The Virginia Commonwealth Government, unaware of the falsity of the records,

statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

580.    As a result of Defendants' conduct, the Commonwealth of Virginia has been damaged, and continues to be damaged, in an amount to be determined at trial.

581.    The Commonwealth of Virginia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### FORTIETH CAUSE OF ACTION
### Washington Medicaid Fraud False Claims Act
### Wash. Rev. Code §§ 74.66.020(1)(a), (b), (c) and (g)
### (As to All Defendants)

582.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

583.    This is a claim for treble damages and penalties under the WA MFFCA.

584.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Washington State Government for payment or approval, in violation of Wash. Rev. Code § 74.66.020(1)(a).

585.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(b).

586.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to commit one or more violations of the WA MFFCA, in violation of Wash. Rev. Code § 74.66.020(1)(c).

96

587.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the Washington State Government, or knowingly concealed or knowingly and improperly avoided or decreased obligations to pay or transmit money or property to the Washington State Government, in violation of Wash. Rev. Code § 74.66.020(1)(g).

588.    The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

589.    As a result of Defendants; conduct, the State of Washington has been damaged, and continues to be damaged, in an amount to be determined at trial.

590.    The State of Washington is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Defendants.

### FORTY-FIRST CAUSE OF ACTION
**Wisconsin False Claims Act**
**Wis. Stat. §§ 20.931(2)(a), (b), (c) and (g)**
**(As to All Defendants)**

591.    Relators repeat and incorporate by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

592.    This is a claim for treble damages and penalties under the WI MFCA.

593.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Wisconsin State Government for payment or approval, in violation of Wis. Stat. § 20.931(2)(a).

97

594. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay false and fraudulent claims, in violation of Wis. Stat. § 20.931(2)(b).

595. Through the acts more particularly set forth in the foregoing paragraphs, Defendants conspired to defraud the Wisconsin State Government by inducing it to approve and pay false and fraudulent claims, in violation of Wis. Stat. § 20.931(2)(c).

596. Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly made, used or caused to be made or used false records or statements material to obligations to pay or transmit money or property to the Wisconsin State Government, in violation of Wis. Stat. § 20.931(2)(g).

597. The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal and hidden marketing and kickback scheme.

598. As a result of Defendants' conduct, the State of Wisconsin has been damaged, and continues to be damaged, in an amount to be determined at trial.

599. The State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Relators, on behalf of the United States, demand judgment against

Defendants, ordering that:

- a. Defendants pay an amount equal to three times the amount of damages that the United States has sustained because of Defendants' actions which Relators currently estimate to be in the millions of dollars, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of 31 U.S.C. § 3729 *et seq.*;

- b. Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730 and/or any other applicable provision of law;

- c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730 and/or any other applicable provision of law;

- d. Petty be awarded such relief as is appropriate under 31 U.S.C. § 3730(h), including, but not limited to, the following:

  - i. Two times the amount of back pay with appropriate interest;

  - ii. Compensation for special damages sustained by Petty in an amount to be determined at trial;

  - iii. Litigation costs and reasonable attorneys' fees in connection with Petty's claim under 31 U.S.C. § 3730(h); and

  - iv. Such punitive damages as may be awarded under applicable law;

- e. Defendants pay a civil fine of $25,000, or such other penalty as the law may permit and/or require, for each violation of the Anti-Kickback Statute; and

- f. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of California, demand judgment against

Defendants, ordering that:

- a. Defendants pay an amount equal to three times the amount of damages that the State of California has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the CA FCA;

99

     b. Relators be awarded the maximum amount allowed pursuant to the CA FCA and/or any other applicable provision of law;

     c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the CA FCA and/or any other applicable provision of law; and

     d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Colorado, demand judgment against

Defendants, ordering that:

     a. Defendants pay an amount equal to three times the amount of damages that the State of Colorado has sustained because of Defendants' actions, plus a civil penalty of not less than \$5,000 and not more than \$10,000, or such other penalty as the law may permit and/or require, for each violation of the CO MFCA;

     b. Relators be awarded the maximum amount allowed pursuant to the CO MFCA and/or any other applicable provision of law;

     c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the CO MFCA and/or any other applicable provision of law; and

     d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Connecticut, demand judgment

against Defendants, ordering that:

     a. Defendants pay an amount equal to three times the amount of damages that the State of Connecticut has sustained because of Defendants' actions, plus a civil penalty of not less than \$5,500 and not more than \$11,000, or such other penalty as the law may permit and/or require, for each violation of the CT FCA;

     b. Relators be awarded the maximum amount allowed pursuant to the CT FCA and/or any other applicable provision of law;

     c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the CT FCA and/or any other applicable provision of law; and

     d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Delaware, demand judgment against

Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the State of Delaware has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the DE FCA;

    b. Relators be awarded the maximum amount allowed pursuant to the DE FCA and/or any other applicable provision of law;

    c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the DE FCA and/or any other applicable provision of law; and

    d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the District of Columbia, demand judgment

against Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the District of Columbia has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the DC FCA;

    b. Relators be awarded the maximum amount allowed pursuant to the DC FCA and/or any other applicable provision of law;

    c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the DC FCA and/or any other applicable provision of law; and

    d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Florida, demand judgment against

Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the State of Florida has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the FL FCA;

b. Relators be awarded the maximum amount allowed pursuant to the FL FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the FL FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Georgia, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the GA FMCA;

b. Relators be awarded the maximum amount allowed pursuant to the GA FMCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by GA FMCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Hawaii, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Hawaii has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the HI FCA;

b. Relators be awarded the maximum amount allowed pursuant to the HI FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by HI FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Illinois, demand judgment against

Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of IL FCA;

    b. Relators be awarded the maximum amount allowed pursuant to IL FCA and/or any other applicable provision of law;

    c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by IL FCA and/or any other applicable provision of law; and

    d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Indiana, demand judgment against

Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of at least $5,000, or such other penalty as the law may permit and/or require, for each violation of the IN FCA;

    b. Relators be awarded the maximum amount allowed pursuant to the IN FCA and/or any other applicable provision of law;

    c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by IN FCA and/or any other applicable provision of law; and

    d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Iowa, demand judgment against

Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the State of Iowa has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the IA MFCA;

    b. Relators be awarded the maximum amount allowed pursuant to the IA MFCA and/or any other applicable provision of law;

    c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the IA MFCA and/or any other applicable provision of law; and

    d. Relators be awarded such other and further relief as this Court may deem just and proper.

    **WHEREFORE,** Relators, on behalf of the State of Louisiana, demand judgment against

Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the LA MFCA;

    b. Relators be awarded the maximum amount allowed pursuant to the LA MFCA and/or any other applicable provision of law;

    c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the LA MFCA and/or any other applicable provision of law; and

    d. Relators be awarded such other and further relief as this Court may deem just and proper.

    **WHEREFORE,** Relators, on behalf of the State of Maryland, demand judgment against

Defendants, ordering that:

    a. Defendants pay an amount equal to three times the amount of damages that the State of Maryland has sustained because of Defendants' actions, plus a civil penalty not to exceed $10,000, or such other penalty as the law may permit and/or require, for each violation of the MD FHCA;

    b. Relators be awarded the maximum amount allowed pursuant to the MD FHCA and/or any other applicable provision of law;

    c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the MD FHCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the Commonwealth of Massachusetts, demand

judgment against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the Commonwealth of Massachusetts has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the MA FCA;

b. Relators be awarded the maximum amount allowed pursuant to the MA FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the MA FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Michigan, demand judgment against

Defendants, ordering that:

a. Defendants pay any and all damages that the State of Michigan has sustained because of Defendants' actions, plus a fine of up to $50,000, or such other penalty as the law may permit and/or require, for each violation of MI MFCA;

b. Relators be awarded the maximum amount allowed pursuant to the MI MFCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the MI MFCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Minnesota, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the

State of Minnesota has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of MN FCA;

b. Relators be awarded the maximum amount allowed pursuant to the MN FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the MN FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Montana, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Montana has sustained because of Defendants' actions, plus a civil penalty of up to $10,000, or such other penalty as the law may permit and/or require, for each violation of MT FCA;

b. Relators be awarded the maximum amount allowed pursuant to the MT FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the MT FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Nevada, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Nevada has sustained because of Defendants' actions, plus a civil penalty of not less than $5,00 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of NV FCA;

b. Relators be awarded the maximum amount allowed pursuant to the NV FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys'

fees as provided by the NV FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of New Hampshire, demand judgment

against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of New Hampshire has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the NH FCA;

b. Relators be awarded the maximum amount allowed pursuant to the NH FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the NH FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of New Jersey, demand judgment

against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the NJ FCA;

b. Relators be awarded the maximum amount allowed pursuant to the NJ FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the NJ FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of New Mexico, demand judgment

against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of New Mexico has sustained because of Defendants' actions or such other penalty as the law may permit and/or require, for each violation of the NM MFCA;

b. Relators be awarded the maximum amount allowed pursuant to the NM MFCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the NM MFCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of New York, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of New York has sustained because of Defendants' actions, plus a civil penalty of not less than $6,000 and not more than $12,000, or such other penalty as the law may permit and/or require, for each violation of the NY FCA;

b. Relators be awarded the maximum amount allowed pursuant to the NY FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the NY FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of North Carolina, demand judgment

against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of North Carolina has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the NC FCA;

b. Relators be awarded the maximum amount allowed pursuant to the NC FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the NC FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Oklahoma, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Oklahoma has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the OK MFCA;

b. Relators be awarded the maximum amount allowed pursuant to the OK MFCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the OK MFCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Rhode Island, demand judgment

against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Rhode Island has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the RI FCA;

b. Relators be awarded the maximum amount allowed pursuant to the RI FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the RI FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Tennessee, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Tennessee has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $25,000, or such other penalty as the law may permit and/or require, for each violation of the TN MFCA;

b. Relators be awarded the maximum amount allowed pursuant to the TN MFCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the TN MFCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Texas, demand judgment against

Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Texas has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the TX MFCA;

b. Relators be awarded the maximum amount allowed pursuant to the TX MFCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the TX MFCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the Commonwealth of Virginia, demand

judgment against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the Commonwealth of Virginia has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the VA FCA;

b. Relators be awarded the maximum amount allowed pursuant to the VA FCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the VA FCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Washington, demand judgment

against Defendants, ordering that:

a. Defendants pay an amount equal to three times the amount of damages that the State of Washington has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000, or such other penalty as the law may permit and/or require, for each violation of the WA MFFCA;

b. Relators be awarded the maximum amount allowed pursuant to the WA MFFCA and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the WA MFFCA and/or any other applicable provision of law; and

d. Relators be awarded such other and further relief as this Court may deem just and proper.

**WHEREFORE,** Relators, on behalf of the State of Wisconsin, demand judgment against

Defendants, ordering that:

e. Defendants pay an amount equal to three times the amount of damages that the State of Wisconsin has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, or such other penalty as the law may permit and/or require, for each violation of the WI MFCA;

f. Relators be awarded the maximum amount allowed pursuant to the WI MFCA and/or any other applicable provision of law;

g. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by the WI MFCA and/or any other applicable provision of law; and

h. Relators be awarded such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relators hereby demand a trial by jury as to all issues.

Dated: New York, New York
November 26, 2012

SEIGER GFELLER LAURIE LLP

By: _William L. Hurlock_
William L. Hurlock

William L. Hurlock (PA Bar No. 312779)
330 Madison Avenue, Sixth Floor
New York, New York 10017
Tel.: (212) 653-8861
Fax: (646) 495-5006
whurlock@sgllawgroup.com


MILBERG LLP

By: _James M. Shaughnessy_
James M. Shaughnessy

James M. Shaughnessy
(*Pro Hac Vice* Admission to be Requested)
One Pennsylvania Plaza
New York, New York 10119
Tel.: (212) 594-5300
Fax: (212) 868-1229
jshaughnessy@milberg.com

112